IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| VERBIO NORTH AMERICA CORPORATION,<br><br>    Plaintiff,<br><br>v.<br><br>WESTON AND ASSOCIATES, LLC,<br><br>    Defendant. | CASE NO. _____<br><br>Story County Law No. LACV051844<br><br><br><br>**NOTICE OF REMOVAL** |

COMES NOW Defendant, Weston and Associates, LLC, by and through undersigned counsel, pursuant to 28 U.S.C. § 1441, and hereby removes the above-captioned case from the Iowa District Court for Story County to the United States District Court, Southern District of Iowa, Central Division.  In support of removal, Defendant states the following:

1.  This action was originally filed in the Iowa District Court for Story County on April 14, 2020, and is now pending in that court.

2.  The above-mentioned action is a civil action for breach of contract, indemnification, and declaratory relief.

3.  The removing party is the sole defendant named in the action.

4.  The action is one of which the United States District Courts are given original jurisdiction by reason of diversity of citizenship of the parties.

5.  The amount in controversy in the action, exclusive of interest and costs, exceeds $75,000.

6.  Defendant accepted service of the Petition and Original Notice on April 30, 2020.

7.  Thirty days have not yet expired since the action became removable to this Court.

8.  At the time of commencement of this action, Plaintiff was a corporation organized and existing under the laws of the Michigan of Iowa, with a principal place of business in Livonia, Michigan; at the time of the commencement of this action, Defendant was and still is a limited liability company organized and existing under the laws of the State of Ohio, with a principal place of business in Navarre, Ohio.

9.  Based on the Petition and the diverse citizenships of the parties, this Court therefore has original jurisdiction of this action under 28 U.S.C. § 1332 and, because defendant is not a citizen or resident of the State of Iowa, in which state this action is pending, removal of the action to this Court is proper under 28 U.S.C. § 1441(a).

10. Copies of all pleadings, process, and orders served on removing party in this action are attached to this notice and marked as Exhibit A.

11. On the date set forth below, a copy of this notice is being served on plaintiff's attorney.  On the same date, a copy of this notice is being filed with the clerk of the Iowa District Court for Story County.

WHEREFORE, for the reasons stated herein, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, and removal is proper pursuant to 28 U.S.C. § 1441. Defendant requests that the above-entitled action be removed from the Iowa District

Court for Story County to the United States District Court for the Southern District of

Iowa, Central Division.

BRADSHAW, FOWLER, PROCTOR & FAIRGRAVE, P.C.


By:   */s/ Bradley M. Beaman*
        Bradley M. Beaman   AT0000318
        801 Grand Avenue, Suite 3700
        Des Moines, IA  50309-8004
        Phone:  (515) 246-5879
        Fax:  (515) 246-5808
        E-Mail:  beaman.bradley@bradshawlaw.com

ATTORNEYS FOR DEFENDANT


Copy to:

Todd M. Lantz
David N. Fautsch
The Weinhardt Law Firm
2600 Grand Avenue
Suite 450
Des Moines, IA 50312
*tlantz@weinhardtlaw.com*
*dfautsch@weinhardtlaw.com*

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing instrument was served upon one of the attorneys of record for all parties to the above-entitled cause by serving the same on such attorney at his/her respective address/fax number as disclosed by the pleadings of record herein, on the 12th of  May, 2020 by:

☐ U.S. Mail                    ☐ FAX
☐ Hand Delivered          ☐ UPS
☐ Federal Express          ☒ Other____ CM-ECF_____

/s/ Peggy Rosky

IN THE IOWA DISTRICT COURT FOR STORY COUNTY

| | |
|---|---|
| VERBIO NORTH AMERICA CORPORATION, | LAW NO.  LACV051844 |
| Plaintiff, | |
| v. | |
| WESTON AND ASSOCIATES, LLC, | **ACCEPTANCE OF SERVICE** |
| Defendant. | |

I, Bradley M. Beaman, represent the Defendant, Weston and Associates, LLC, and hereby accept service of the Original Notice and Petition and Jury Demand on the Defendant's behalf.

BRADSHAW, FOWLER, PROCTOR & FAIRGRAVE, P.C.

By:    */s/ Bradley M. Beaman*
      Bradley M. Beaman  AT0000318
      801 Grand Avenue, Suite 3700
      Des Moines, IA  50309-8004
      Phone:  (515) 246-5879
      Fax:  (515) 246-5808
      E-Mail:  beaman.bradley@bradshawlaw.com

ATTORNEYS FOR DEFENDANT

EXHIBIT A

Copy to:

Todd M. Lantz
David N. Fautsch
2600 Grand Avenue
Suite 450
Des Moines, IA 50312
*tlantz@weinhardtlaw.com*
*dfautsch@weinhardtlaw.com*

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing instrument was served upon
one of the attorneys of record for all parties to the above-entitled cause by serving the same on
such attorney at his/her respective address/fax number as disclosed by the pleadings of record
herein, on the 30th of April, 2020 by:

☐ U.S. Mail            ☐ FAX
☐ Hand Delivered       ☐ UPS
☐ Federal Express      ☒ Other ___ EDMS _____

/s/ Peggy Rosky _____

IN THE IOWA DISTRICT COURT FOR STORY COUNTY

| | | |
|---|---|---|
| VERBIO NORTH AMERICA CORPORATION, | ) ) ) | Case No. _____ |
| Plaintiff, | ) ) | |
| v. | ) ) | **PETITION AND JURY DEMAND** |
| WESTON AND ASSOCIATES, LLC, | ) ) ) | |
| Defendant. | ) ) ) | |

The Plaintiff, Verbio North America Corporation, states the following for its Petition and Jury Demand:

## PARTIES, JURISDICTION, AND VENUE

1.      The Plaintiff, Verbio North America Corporation ("Verbio"), is a Michigan corporation with its principal place of business in Livonia, Michigan.  Verbio owns an industrial facility in Nevada, Iowa.  That facility is the subject of this lawsuit.

2.      The Defendant, Weston and Associates, LLC ("Weston"), is an Ohio limited liability company.

3.      Venue is proper in this Court because the contract between Verbio and Weston was to be performed in Story County, Iowa.  *See* Iowa Code § 616.7.  That contract also provided that the default dispute resolution procedure was litigation in either the state or federal court having jurisdiction of this matter in the location of the construction project at issue, which is in Story County.  Since the parties did not otherwise select a dispute resolution procedure in the contract, the default procedure (litigation) applies to this dispute.

4.      The amount in controversy exceeds the jurisdictional requirements for this Court.

## FACTUAL ALLEGATIONS

### The Project and Contract

5.        Verbio owns property in Nevada, Iowa, where it is constructing a Biorefinery Plant (the "Biorefinery Plant").  When it is complete and operational, the Biorefinery Plant will use bailed crop residue to produce renewable natural gas and digestate.

6.        The Biorefinery Plant requires eight 10,000 $m^3$ fermenter tanks (the "Tanks"), each capable of storing about 2.6 million gallons of liquid.

7.        Weston holds itself out as an "expert in bolted tank construction" and "a specialty consultant for both the liquid and dry bulk storage tank industry, offering comprehensive management solutions from preliminary development, project engineering, procurement, total project construction services, project commissioning and facility servicing."

8.        In late 2018 and early 2019, Weston and Verbio discussed the possibility of Weston performing services to design, deliver, and assemble the Tanks for the Biorefinery Plant. Verbio supplied "Technical Specifications," which included various requirements for construction of the Tanks and foundations that were important to Verbio.

9.        On January 22, 2019, after Weston submitted multiple bids, Weston and Verbio executed a Standard Agreement and General Conditions Between Owner and Vendor (Lump Sum) for Design Delivery, and Assembly of eight (8) 10,000 $m^3$ fermenter tank including the foundation and insulation" (the "Contract").  A true and accurate copy of the Contract including all exhibits thereto is attached as Exhibit A to this Petition.

10.       Verbio's Technical Specifications were attached to the Contract and expressly made part of the Contract upon its execution (per Section 2.3.1 of the Contract).  As a part of the Contract, the Technical Specifications were also part of the "Contract Documents" (as defined in Section 2.3.4 of the Contract).

11.     Weston's general responsibilities under the Contract included the provision of all labor, materials, equipment, and services necessary to complete the "Work" (as defined in the Contract) in full accord with the Contract Documents and any work reasonably inferable from the Contract Documents.  Weston was further responsible for the supervision and coordination of the Work, including the construction means, methods, techniques, sequences, and procedures utilized.

12.     Weston agreed in the Contract to execute the Work in accordance with the Contract Documents in a workmanlike manner (per Section 3.5).

13.     Weston expressly warranted in the Contract that all materials and equipment shall be new unless otherwise specified, of good quality, in conformance with the Contract Documents, and free from defective workmanship and materials.  Weston further warranted that the Work would be free from material defects not intrinsic in the design or materials required in the Contract Documents.

14.     Verbio delivered a written purchase order on January 22, 2019, thereby commencing Weston's performance obligations under the Contract.

15.     The Contract specified certain deadlines for Weston's performance.  By no later than March 15, 2019, Weston was responsible for delivering various project documents known as "First Documentation."   Also, final completion of Weston's work, including structural completion of the Tanks confirmed by a certificate of final completion, was to be achieved no later than October 31, 2019.

16.     The Contract contained a lump sum price of $13,400,000.00 subject to any adjustment for changes in the scope or timing of Weston's work.  The terms of payment were specified in Exhibit E to the Contract.

17.     To fulfill its requirements under the Contract, Weston engaged various parties, including a manufacturer for the Tanks, other material suppliers, subcontractors, and a structural engineer for the foundations.

Inexcusable Delays in its Contract Performance

18.     Weston did not deliver the required project documentation (First Documentation) until May 21, 2019, which was over two months after the contractual deadline.

19.     With the First Documentation, Weston produced a schedule projecting completion of its work on February 29, 2020, which was four months after the contractual deadline.

20.     Weston did not execute a contract with foundation subcontractor (Woodruff Construction) until June 2019, nearly five months after the Contract was finalized.

21.     As of October 31, 2019, which was the deadline in the Contract for final completion of Weston's work, Weston, through its subcontractors, had just recently finished installing the Tank foundations and had partially constructed only two of the Tanks.

22.     Paragraph 6.3.1 allowed Weston to provide written notice to Verbio if it encountered delays for any reason and request an extension of the time to perform under the Contract.  With one limited exception, Weston never utilized that process.  Thus, all other delays were unjustified and Weston's responsibility.

23.     Section 6.5 of the Contract established liquidated damages owed to Verbio due to Weston's delays:

> 6.5.1   FINAL COMPLETION Liquidated damages based on the Final Completion date shall apply.
>
> 6.5.2   Owner will suffer damages which are difficult to determine and accurately specify if the Final Completion date, as may be amended by subsequent Change Order, is not attained.  Vendor shall pay Owner 0.15% of the Contract Price as liquidated damages and not as a penalty for each Day that Final Completion extends beyond the Final Completion Date.  The liquidated damages are limited up to 5% of the contract price.

6.5.3   The FIRST DOCUMENTATION in accordance to 6.1.2 is also part of liquidated damages.   The FIRST DOCUMENTATION shall be delivered electronically to the Owner based under the conditions that the soil report will be provided until February 21.

24.      Per Section 6.5.2, the liquidated damages for Weston's delay were $20,100 per day up to a maximum of $670,000 (33 1/3 days).

25.      Weston failed to deliver the First Documentation by March 15, 2019 and further failed to perform its contractual responsibilities to final completion by October 31, 2019. Accordingly, Weston owes liquidated damages totaling $670,000.

26.      Additionally, Section 6.4 of the Contract states in part:  "If [Weston] causes delay in the completion of the Work, [Verbio] shall be entitled to recover its additional costs …" Verbio has suffered and will continue to suffer additional costs as a direct result of Weston's inexcusable delay in performing under the Contract.

<u>Increased Costs</u>

27.      Weston also made several inexcusable errors related to the cost of the work that it agreed to perform, and Verbio ultimately suffered damages as a consequence.

28.      One error related to the concrete foundations for the Tanks.  As part of the Contract, Weston agreed to obtain the necessary design and construction services to build concrete foundations that satisfied Verbio's Technical Specifications.

29.      Verbio's Technical Specifications clarified a maximum crack width limitation of 0.15 mm.  That limitation is important to avoid leaks, which can result in environmental hazards, environmental liabilities, and major repairs that disrupt the Biorefinery Plant operations.

30.      Weston engaged a structural engineer to provide a preliminary foundation drawing, which evidently Weston used for its bid.  The structural engineer later provided a foundation drawing for construction purposes.  However, neither the preliminary drawing nor the

first construction drawing satisfied Verbio's Technical Specifications, particularly the 0.15 mm crack width limitation.

31.      In April 2019, after Weston's structural engineer revised the foundation drawings – but still had not provided calculations to show that the revised drawings would satisfy the crack width limitation – Weston delivered Change Order #1 requesting an additional $1,693,292.00 for labor and materials to install the foundations that met Verbio's Technical Specifications (part of the Contract Documents).

32.      On May 1, 2019, pursuant to Section 8.2 of the Contract, Verbio issued Interim Directive #1 to Weston, which directed Weston to continue working and to procure the materials and installation of the foundations that were necessary to meet Verbio's Technical Specifications.  At the same time, Verbio requested a written document pursuant to Section 8.4 of the Contract explaining why Weston believed that there was a change in work scope compared to the Contract.  Weston never provided that written explanation for Change Order #1.

33.      A second error that increased Verbio's costs resulted from Weston's failure to communicate certain Tank specifications to the Tank manufacturer, Permastore.

34.      Before executing the Contract, Weston and Verbio discussed how the Tanks could be constructed with an opening for a Bobcat machine to enter and exit.  Weston represented that such openings were standard on the Tanks.

35.      After the first construction drawings were issued, Verbio asked Weston in writing that the Tanks be adjusted to allow a Bobcat opening.  Weston replied this adjustment was "no problem."  Weston also explained that the Bobcat opening would be shown on the assembly drawings.

36.     Weston was solely responsible for communications with Permastore.  As such, it was Weston's exclusive responsibility to communicate with Permastore about Verbio's specifications.

37.     Weston failed to notify Permastore about the need for a Bobcat opening.  Weston also failed to notify Permastore about the location of brackets on the exterior of the Tanks even though the brackets were contained in the Technical Specifications.

38.     Verbio ultimately incurred additional costs due to Weston's failure to inform Permastore about the requirements that the parties discussed, that Weston represented were "standard," and that were expressly included in the Contract Documents.  The total additional costs for Verbio were $472,996, not including the additional labor costs involved in these items.

<u>Defective Work</u>

39.     In October 2019, while the first two Tanks (known as 4.1 and 4.2) were under construction, Verbio identified quality issues with the glass panels that Weston obtained and was installing.  Verbio promptly provided written notice of the quality concerns and photographs to Weston.

40.     Further investigation in October 2019 revealed several major defects in Weston's construction of Tanks 4.1 and 4.2:

a.      There were hundreds of fractures on the inside of glass panels that comprised the walls of Tanks 4.1 and 4.2 and the roof of Tank 4.1 (Weston had not started on the roof of Tank 4.2 at the time of the investigation).  The fractures were caused because Weston, through its employees or its subcontractor's employees, failed to use measured and proper torque settings and did not apply adequate sealant when tightening bolts to secure the glass

panels.   These errors violated the Permastore construction manual for the Tanks.

b.       Some of the glass panels were rusted and deteriorated due to incorrect storage of the panels onsite.  Per Section 3.12.2.2 of the Contract, Weston was responsible for proper delivery, handling, application, storage, removal, and disposal of all materials and substances brought to the worksite.

c.       Weston installed the roof of Tank 4.1 incorrectly.   Permastore's construction manual required installation of panels from the perimeter to the center, but Weston had installed the roof panels from the center to the perimeter.  Consequently, the roof panels did not overlap correctly and needed to be dismantled, cleaned, repaired, and reinstalled.

d.       Tank 4.1 was constructed at the wrong orientation.   It was turned 90 degrees from the orientation shown in the site drawings.

41.       On October 23, 2019, representatives of Verbio, Weston, and Permastore met to discuss these defects in Weston's work and how they would be corrected.   After the meeting, Weston confirmed the accuracy of meeting minutes detailing these defects, and Weston agreed to take several actions to correct the defects.

42.       Also at the October 23 meeting, Weston and Verbio discussed the need for a cold weather plan, which would not have been necessary if Weston had complied with the performance deadlines in the Contract.   Verbio wanted to ensure the sealant used in the Tank construction was applied in accordance with the sealant manufacturer's requirements as to the ambient air temperature and the surface temperature of the glass panels to allow proper curing of the sealant.  Weston agreed to propose a cold weather plan that Verbio would need to approve.

43.     Weston proposed a procedure for heating up the sealant and panels, but Weston's proposal did not meet the sealant manufacturer's temperature requirements for proper curing.  In fact, Weston rejected the sealant manufacturer's cure-time requirement.  However, if the sealant was not installed in conformance with the sealant manufacturer's requirements, it would have eliminated all warranties from the sealant manufacturer.  Verbio understandably was not willing to sacrifice those warranties, so it rejected Weston's proposed cold weather plan.

Worksite Fatality

44.     On November 14, 2019, Verbio notified Weston that its proposed cold weather plan was unacceptable.  In response, Weston and its tank construction subcontractor began demobilizing from the work site without Verbio's authorization.

45.     As part of the demobilization, Weston and/or one of its subcontractors began disconnecting and removing jacks that were used as temporary supports for components of the Tanks.

46.     Unfortunately, Weston and/or its subcontractor was extremely careless in how it removed the jacks supporting one of the Tank components.  As a direct and proximate result of that failure to use reasonable care, a substantial Tank component fell on an employee of one of Weston's subcontractors, killing him.

47.     Verbio was not involved in or responsible for the demobilization efforts by Weston and its subcontractor.

48.     The work site fatality led to a suspension in the erection of the Tanks and a lengthy and involved investigation by the Occupational Safety and Health Administration ("OSHA").  Verbio reasonably incurred costs, including professional fees charged by lawyers and engineers, in order to respond to the OSHA investigation.

<u>Weston's Termination</u>

49.        On November 27, 2019, Verbio sent Weston a Notice of Default pursuant to Section 11.2 of the Contract.  Verbio identified numerous material breaches of the Contract, including Weston's defective work, Weston's inexcusable delay, Weston's failure to relay Verbio's specifications to Permastore, Weston's error that led to Change Order #1, and Weston's failure to use reasonable care that led to the work site fatality.  Verbio demanded that Weston cure its violations of the Contract

50.        In early December 2019, Weston responded to the Notice of Default by erroneously denying that it was responsible for any Contract violation.  For instance, Weston denied that any work was defective, contrary its agreement with the minutes from the October 23, 2019 meeting wherein numerous defects were identified.  Weston also denied responsibility for delaying the project, even though it had partially constructed only two of the Tanks.

51.        On December 5, 2019, Verbio sent a second Notice of Default pursuant to Section 11.2.1 of the Contract.  In that document, Verbio reminded Weston if its obligation to continue performing work during the dispute resolution procedure.  As of that date, Weston had abandoned the work site and failed to complete any corrective action to address its prior defective work.

52.        On December 10, 2019, Verbio provided written notice that it was terminating Weston for default pursuant to Section 11.3.1 of the Contract.

53.        Section 11.3.1 of the Contract allows that if Weston is terminated for default and "[i]f [Verbio's] costs arising out of [Weston's] failure to cure, including the costs of completing the Work and reasonable attorneys' fees, exceed the unpaid Contract Price, [Weston] shall be liable to [Verbio] for such excess costs."

54.     Verbio has made reasonable efforts to mitigate its damages and complete all the work within Weston's scope under the Contract.  However, the total cost of completing Weston's work is now expected to greatly exceed $13,400,000 plus the one change order approved prior to Weston's termination ($153,134.50).  The additional cost, which is currently estimated at least $2.5 million, is an injury to Verbio and is recoverable under Section 11.3.1 of the Contract.

<u>Weston's Claims to Payment</u>

55.     Exhibit E to the Contract outlined 44 payments that would be due upon certain milestones in Weston's performance.

56.     The first payment, which equaled 10% of the Contract price ($1,340,000), was to be used as a retainer and would be payed after final completion of Weston's work, according to Exhibit E to the Contract.  Half of that amount would be due to Weston upon delivery and verification of the documentation that the work was complete, and the other half would be due to Weston at the conclusion of a five-year warranty period.  This 10% retainer was included in the payment schedule in lieu of requiring a performance bond from Weston.

57.     Weston never earned the 10% retainer amount because it did not complete the project.  Indeed, Weston seemingly acknowledged this fact, since it never issued an invoice or submitted a pay application to Verbio for the retainer.

58.     On February 7, 2020, Weston filed a mechanics lien (MLNR Number 021472-0) on the Biorefinery Plant, erroneously claiming that it was owed the entire 10% retainer ($1,340,000).

59.     Weston's mechanics lien also erroneously claimed that it was owed $1,484,733.32 for the installation of the last four foundations at the Biorefinery Plant.  However, Weston was not due those sums, and even if it was, Verbio was justified in withholding payment pursuant to Section 11.2.2 of the Contract.

60.     Weston was not due payment for the last four foundations because Verbio paid the foundation subcontractor directly for that work in January 2020, after Weston's termination. In total, Verbio paid $1,672,498.90 to the foundation subcontractor, which included charges for the last four foundations (i.e., the work for which Weston filed a mechanics lien), and nearly $300,000 in retainage that Weston withheld from the foundation subcontractor.

Sunbelt Lien

61.     In January 2020, a separate vendor, Sunbelt Rentals, Inc. ("Sunbelt"), filed a mechanics lien on the Biorefinery Plant.  Sunbelt claims to have supplied equipment to one of Weston's subcontractors, and it claims to be owed $17,383.75 for unpaid equipment rental charges.  Verbio never received any demand for payment from Sunbelt.  The Sunbelt lien is properly the responsibility of Weston.

## COUNT I – BREACH OF WRITTEN CONTRACT

62.     Verbio incorporates the above allegations as though set forth fully here.

63.     The Contract is a valid and enforceable contract.

64.     At all relevant times, Verbio performed its obligations under the Contract, except those obligations that were excused as a result of Weston's breach.

65.     Weston materially breached the Contract and Verbio incurred damages as a result of Weston's breach of its obligations.  Among other things, Weston inexcusably delayed its work and caused Verbio to incur additional costs; Weston's work was defective and required correction; Weston failed to communicate Verbio's specifications to Permastore; Weston incorrectly charged Verbio for additional costs resulting from Weston's error in determining the cost of the foundations that would satisfy Verbio's Technical Specifications; and Weston failed to use reasonable care to protect the safety of a subcontractor's personnel during an unauthorized demobilization.

66.      Given Weston's failure to cure its many violations of the Contract, Verbio justifiably terminated Weston for default.  As such, under the express terms of the Contract and under Iowa contract law, Weston is responsible for the total additional cost of completing its scope of work.

67.      Verbio has been damaged and will continue to incur damages as a result of Weston's breaches of the Contract and Weston's breach of its express warranties in an amount to be proven at trial.

68.      Furthermore, Section 12.3.3 provides that the costs of litigation and reasonable attorneys' fees shall be borne by the non-prevailing party, as determined by the adjudicator of the dispute.  Accordingly, Verbio seeks to recover from Weston the expenses associated with this action and Verbio's reasonable attorneys' fees.

WHEREFORE, the Plaintiff, Verbio North America Corporation, prays that the Court enter a judgment in its favor and against the Defendant, Weston and Associates, LLC, for an amount to be determined at trial, plus interest, taxable costs, reasonable attorney fees, and other expenses associated with this action.

## COUNT II – INDEMNIFICATION

69.      Verbio incorporates the above allegations as though set forth fully here.

70.      Under Article 10 of the Contract and under Iowa law, Weston is responsible for indemnifying Verbio for all damages resulting from Weston's breach of its contractual obligations.

WHEREFORE, the Plaintiff, Verbio North America Corporation, prays that the Court enter a judgment in its favor and against the Defendant, Weston and Associates, LLC, for an amount to be determined at trial, plus interest, taxable costs, reasonable attorney fees, and other expenses associated with this action.

## COUNT III – DECLARATORY RELIEF

71.     Verbio incorporates the above allegations as though set forth fully here.

72.     Verbio seeks a declaration pursuant to Iowa Code § 572.24 that Weston's mechanics lien (MNLR Number 021472-0) is invalid, unenforceable, frivolous, or valid only for a lesser amount.

WHEREFORE, the Plaintiff, Verbio North America Corporation, prays that the Court enter a judgment providing a declaration that Mechanics Lien MNLR Number 021472-0 is invalid, unenforceable, frivolous, or valid only for a lesser amount and submit the ruling to the Secretary of State for posting to the MNLR internet site, and for costs and interests and other relief as the Court deems just and appropriate.

## JURY DEMAND

73.     Verbio hereby demands a trial by jury on all issues triable as of right.


THE WEINHARDT LAW FIRM

By */s/ Todd M. Lantz*
    Todd M. Lantz         AT0010162
    David N. Fautsch      AT0013223
    2600 Grand Avenue, Suite 450
    Des Moines, IA  50312
    Telephone:  (515) 244-3100
    E-mail:  tlantz@weinhardtlaw.com
      dfautsch@weinhardtlaw.com

ATTORNEYS FOR VERBIO NORTH AMERICA
    CORPORATION

# STANDARD AGREEMENT AND GENERAL CONDITIONS BETWEEN OWNER AND VENDOR (Lump Sum)

## DESIGN, DELIVERY and ASSEMBLY
### of
### eight (8) 10.000 m³ fermenter tank including the foundation and insulation

**TABLE OF ARTICLES**

1. AGREEMENT
2. GENERAL PROVISIONS
3. VENDOR'S RESPONSIBILITIES
4. OWNER'S RESPONSIBILITIES
5. SUBCONTRACTS
6. TIME
7. PRICE
8. CHANGES
9. PAYMENT
10. INDEMNITY, INSURANCE, AND BONDS
11. SUSPENSION, NOTICE TO CURE, AND TERMINATION
12. DISPUTE MITIGATION AND RESOLUTION
13. MISCELLANEOUS
14. CONTRACT DOCUMENTS

**ARTICLE 1 AGREEMENT**

Agreement number: "VNV-VHP-001"

This Agreement is made this 22th day of January in the year 2019,

by and between the

OWNER, Verbio North America Corporation, a Michigan corporation

and the

VENDOR, Weston and Associates, LLC, an Ohio limited liability company

Tax identification number (TIN) 82-3098245
Contractor License No., if applicable [          ]
for construction and services in connection with the following

PROJECT Strawbiomethane Plant Nevada
Design Professional will be set by the owner after order.

**This agreement only becomes effective upon written order.**

EXHIBIT

A



**ARTICLE 2 GENERAL PROVISIONS**

2.1 PARTIES' RELATIONSHIP Each Party agrees to act on the basis of mutual trust, good faith, and fair dealing, and perform in an economical and timely manner. The Parties shall each endeavor to promote harmony and cooperation among all Project participants.

2.1.1 Neither Vendor nor any of its agents or employees shall act on behalf of or in the name of Owner.

2.2 ETHICS Each Party shall perform with integrity. Each shall: (a) avoid conflicts of interest; and (b) promptly disclose to the other Party any conflicts that may arise. Each Party warrants it has not and shall not pay or receive any contingent fees or gratuities to or from the other Party, including its agents, officers, employees, Subcontractors, Subsubcontractors, Suppliers, or Others to secure preferential treatment.

2.3 DEFINITIONS

2.3.1 "Agreement" means this Agreement and General Conditions Between Owner and Vendor (Lump Sum), as modified, and exhibits and attachments made part of this agreement upon its execution.

2.3.1.1 The following exhibits are part of this Agreement:
Exhibit A: Layout for the tanks.
Exhibit B: flat layout fermenter tanks and overview hatch:
Exhibit C: specification Verbio
Exhibit D: documentation list
Exhibit E: payment
Exhibit F: offer Weston

2.3.2 "Business Day" means all Days, except weekends and official federal or state holidays where the Project is located.

2.3.3 A "Change Order" is a written order signed by the Parties after execution of this Agreement, indicating a change in the scope of the Work, Contract Price, or Contract Time, including substitutions proposed by Vendor and accepted by Owner.

2.3.4 The "Contract Documents" consist of (a) this Agreement; (b) documents listed in §14.1 as existing contract documents; (c) drawings, specifications, addenda issued and acknowledged before execution of this Agreement; and (d) Change Orders, Interim Directives, and amendments issued in accordance with this Agreement.

2.3.5 "Contract Price" is the amount indicated in §7.1 and represents full compensation for performance by the Vendor of the Work in conformance with the Contract Documents.

2.3.6 "Contract Time" is the period between the Date of Commencement and the total time authorized to achieve Final Completion in §6.1.1.

2.3.7 "Vendor is the person or entity identified in ARTICLE 1. References to General Contractor or Contractor in the Contract Documents may be a reference to Vendor.

2.3.8 "Cost of the Work" means the costs and discounts specified in §8.3.4.

2.3.9 "Date of Commencement" is as set forth in §6.1.

2.3.10 "Day' means a calendar day.

2.3.11 "Defective Work" is any portion of the Work that does not conform to the requirements of the Contract Documents.

2.3.12 "Design Professional" means the licensed architect or engineer, and its consultants, retained by Owner to perform design services for the Project.

**Agreement VNA - WESTON**
Page **2** of **25**



2.3.13 "Final Completion" occurs on the date when tank is structurally complete and accepted by Owner and final payment becomes due and payable. This date shall be confirmed by a Certificate of Final Completion signed by Parties.

2.3.14 "Hazardous Material" is any substance or material identified now or in the future as hazardous under the Law, or any other substance or material that may be considered hazardous or otherwise subject to statutory or regulatory requirement governing handling, disposal, or cleanup.

2.3.15 "Law" means federal, state, or local law, ordinance, code, rule, and regulations applicable to the Work with which Vendor must comply **that are enacted as of the Agreement** date.

2.3.16 "Interim Directive" is a written order containing Work instructions directed by Owner pursuant to §8.2 and that is signed by **Owner after execution** of this Agreement and before Substantial Completion.

2.3.17 "Others" means Owner's other: (a) contractors/Vendors, (b) suppliers, (c) subcontractors, subsubcontractors, or suppliers of **(a) and (b); and others** employed directly or indirectly by (a), (b), or (c) or any by any of them **or for whose** acts any of them may be liable.

2.3.18 "Overhead" means (a) payroll costs, burden, and other compensation of Vendor's employees in Vendor's principal and **branch offices;** (b) general and administrative expenses of Vendor's principal **and** branch offices including charges against Vendor for delinquent payments; and (c) Vendor's capital expenses, including interest on capital used for the Work.

2.3.19 "Owner" is **the person or** entity identified in ARTICLE 1.

2.3.20 The "Parties" **are collectively Owner and Vendor.**

2.3.21 The "Project," as identified in ARTICLE 1, is the building, facility, or other improvements for which Vendor is to perform Work under the Contract Documents. It may also include construction by Owner or Others.

2.3.22 The "Schedule of the Work" is the document prepared by Vendor that specifies the dates on which Vendor plans to begin and complete various parts of the Work, including dates on which information and approvals are required from Owner.

2.3.23 A "Subcontractor" is a person or entity retained by Vendor as an independent contractor to provide the labor, materials, equipment, or services necessary to complete a specific portion of the Work. The term Subcontractor does not include Design Professional or Others.

2.3.24 A "Subsubcontractor" is a person or entity who has an agreement with a Subcontractor, another subsubcontractor, or Supplier to perform a portion of the Work or to supply material or equipment.

2.3.25 A "Supplier" is a person or entity retained by Vendor to provide material or equipment for the Work.

2.3.26 "Terrorism" means a violent act, or an act that is dangerous to human life, property, or infrastructure, that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion. Terrorism includes, but is not limited to, any act certified by the United States government as an act of terrorism pursuant to the Terrorism Risk Insurance Act, as amended.

2.3.27 "Work" means the construction and services necessary or incidental to fulfill Vendor's obligations for the Project in accordance with and reasonably inferable from the Contract Documents. The Work may refer to the whole Project or only a part of the Project if work is also being performed by Owner or Others..

2.3.28 "Worksite" means the area of the Project location identified in ARTICLE 1 where the Work is to be performed.

**ARTICLE 3 VENDOR'S RESPONSIBILITIES**

**Agreement VNA - WESTON**
Page 3 of 25



Vendor shall use its best efforts to perform the Work in an expeditious manner consistent with the Contract Documents.

## 3.1 GENERAL RESPONSIBILITIES

3.1.1 Vendor shall provide all labor, materials, equipment, and services necessary to complete the Work, all of which shall be provided in full accord with the Contract Documents and shall include any Work reasonably inferable from the Contract Documents.

3.1.2 Vendor represents that it is an independent contractor and that it is familiar with the type of work required by the Contract Documents.

3.1.3 The Vendor shall be responsible for the supervision and coordination of the Work, including the construction means, methods, techniques, sequences, and procedures utilized.

3.1.4 Vendor shall perform Work only within locations allowed by the Contract Documents, Law, and applicable permits.

## 3.2 COOPERATION WITH WORK OF OWNER AND OTHERS

3.2.1 Owner may perform work at the Worksite directly or by Others. Any agreements with Others to perform construction or operations related to the Project shall include provisions pertaining to insurance, indemnification, waiver of subrogation, consequential damages, coordination, interference, cleanup, and safety that are substantively the same as the corresponding provisions of this Agreement.

3.2.2 If Owner elects to perform work at the Worksite directly or by Others, the Parties shall coordinate the activities of all forces at the Worksite and agree upon fair and reasonable schedules and operational procedures for Worksite activities. Owner shall require each separate contractor to cooperate with Vendor and to assist with the coordination of activities and the review of construction schedules and operations. In accordance with §6.3, Contract Price and Contract Time may be equitably adjusted for changes resulting from the coordination of construction activities, and the Schedule of the Work shall be revised accordingly. Vendor is not liable for any damages, claims, or losses related to delays in the Work as required by this Agreement or Contract Documents directly or indirectly related to the Owner's election to perform work at the Worksite.

3.2.3 With regard to the work of Owner and Others, Vendor shall: (a) proceed with the Work in a manner that does not hinder, delay, or interfere with the work of Owner or Others or cause the work of Owner or Others to become defective; (b) afford Owner and Others reasonable access for introduction and storage of their materials and equipment and performance of their activities; and (c) coordinate Vendor's Work with theirs.

3.2.4 Before proceeding with any portion of the Work affected by the construction or operations of Owner or Others, Vendor shall give Owner prompt written notification of any known defects Vendor discovers in their work which will prevent the proper execution of the Work. Vendor's obligations in this subsection do not create a responsibility for the work of Owner or Others, but are for the purpose of facilitating the Work. If Vendor does not notify Owner of defects interfering with the performance of the Work, Vendor acknowledges that the work of Owner or Others is not defective and is acceptable for the proper execution of the Work. Following receipt of written notice from Vendor of defects, Owner shall promptly issue an Interim Directive informing Vendor what action, if any, Vendor shall take with regard to the defects.

## 3.3 CONTRACT DOCUMENT REVIEW

3.3.1 Before commencing the Work, Vendor shall examine and compare the drawings and specifications with information furnished in the Contract Documents, relevant field measurements made by Vendor, and any visible conditions at the Worksite affecting the Work.

3.3.2 Should Vendor discover any errors, omissions, or inconsistencies in the Contract Documents, Vendor shall promptly report them to Owner. It is recognized, however, that Vendor is not acting in the capacity of a licensed design professional, and that Vendor's examination is to facilitate construction and does not create an affirmative responsibility to detect errors, omissions, or inconsistencies or to ascertain compliance with a Law, building code, or regulation and that the Vendor will not be liable for any damages, claims, or losses that occur directly or indirectly as a result of the Vendor's review.. Following receipt of written notice from Vendor of errors,

**Agreement VNA - WESTON**
Page 4 of 25

omissions, or inconsistencies, Owner shall promptly inform Vendor what action, if any, Vendor shall take with regard to the errors, omissions, or inconsistencies.

3.3.3 In accordance with this Agreement, Vendor may be entitled to adjustments of the Contract Price or Contract Time **because of** clarifications or instructions arising out of Vendor's reports described in this §3.3.

## 3.4 CONSTRUCTION **PERSONNEL AND SUPERVISION**

3.4.1 Vendor shall provide competent supervision for the performance of the Work. Before commencing the Work, Vendor shall notify Owner in writing of the name and qualifications of its proposed superintendent(s) and project manager so Owner may review their qualifications. If, for reasonable cause, Owner refuses to approve an individual, or withdraws its approval after once giving it, Vendor shall name a different superintendent or project manager for Owner's review. Any disapproved superintendent shall not perform in that capacity thereafter at the Worksite.

3.4.2 Vendor shall be responsible to Owner for acts or omissions of a person or entity performing on behalf of Vendor or any of its Subcontractors and Suppliers.

3.4.3 Vendor shall permit only qualified persons to perform the Work. Vendor shall enforce safety procedures, strict discipline, and good order among persons performing the Work. If Owner and Vendor determine that a particular person does not follow safety procedures, or is unfit or unskilled for the assigned Work, Vendor shall within five (5) Days reassign the person upon receipt of Owner's Interim Directive to do so.

3.4.4 VENDOR'S REPRESENTATIVE Vendor's authorized representative is
    Nathan Blackwood. Vendor's Representative shall possess full authority to
receive instructions from Owner and to act on those instructions. If Vendor changes its representative or the representative's authority, Vendor shall immediately notify Owner in writing.

3.5 WORKMANSHIP The Work shall be executed in accordance with the Contract Documents in a workmanlike manner. All materials used in the Work shall be furnished in sufficient quantities to facilitate the proper and expeditious execution of the Work and shall be new except as otherwise provided in the Contract Documents.

3.6 MATERIALS FURNISHED BY OWNER OR OTHERS If the Work includes installation of materials or equipment furnished by Owner or Others, Vendor to examine the items so provided and thereupon handle, store, and install the items, unless otherwise provided in the Contract Documents, with such skill and care as to provide a satisfactory and proper installation. Loss or damage due to acts or omissions of Vendor shall be the responsibility of Vendor and may be deducted from any amounts due or to become due Vendor. Any defects discovered in such materials or equipment shall be reported to Owner within five (5) Business Days. Following receipt of written notice from Vendor of defects, Owner shall promptly inform Vendor what action, if any, Vendor shall take with regard to the defects.

3.7 TESTS AND INSPECTIONS

3.7.1 Vendor shall schedule all required tests, approvals, and inspections of the Work or portions thereof at appropriate times so as not to delay the progress of the Work or other work related to the Project. Vendor shall give proper notice to all required parties of such tests, approvals, and inspections. If feasible, Owner and Others may timely observe the tests at the normal place of testing. Except as provided in §3.7.3, Owner shall bear all expenses associated with tests, inspections, and approvals required by the Owner, excluding the test conducted by the Vendor which are defined in the Vendor's offer Exhibit C and paid by the Vendor. which shall be conducted by an independent testing laboratory or entity retained by Owner. Unless otherwise required by the Contract Documents, required certificates of testing, approval, or inspection shall be secured by Vendor and delivered to Owner within the documentation.

3.7.2 If Owner or appropriate authorities determine that tests, inspections, or approvals in addition to those required by the Contract Documents will be necessary, Vendor shall arrange for the procedures and give timely notice to Owner and Others who may observe the procedures. Costs of the additional tests, inspections, or approvals are at Owner's expense except as provided in the subsection below.

3.7.3 If the procedures described in the two subsections immediately above indicate that portions of the Work fail to comply with the Contract Documents, Vendor shall be responsible for costs of correction and retesting.

**Agreement VNA - WESTON**
Page 5 of 25

3.8 WARRANTY

3.8.1 Vendor warrants that all materials and equipment shall be new unless otherwise specified, of good quality, in conformance with the Contract Documents, and free from defective workmanship and materials. At Owner's reasonable request, Vendor shall furnish satisfactory evidence of the quality and type of materials and equipment furnished. Vendor further warrants that the Work shall be free from material defects not intrinsic in the design or materials required in the Contract Documents. Vendor's warranty does not include remedies for defects or damages caused by normal wear and tear during normal usage, use for a purpose for which the Project was not intended, improper or insufficient maintenance, modifications performed by Owner or others, or abuse. Vendor's warranty shall commence on the Date of Final Completion of the Work.

3.8.2 Vendor shall obtain from its Subcontractors and Suppliers any special or extended warranties required by the Contract Documents. Vendor's liability for such warranties shall be limited to the five-year correction period as provided in the section below.

3.9 CORRECTION OF WORK

3.9.1 Before Final Completion and within five years after the date of Final Completion of the Work, if any Defective Work is found, Owner shall promptly notify Vendor in writing. Unless Owner provides written acceptance of the condition, Vendor shall promptly correct the Defective Work at its own cost and time and bear the expense of reasonable additional services, excluding cleaning costs, required for correction of any Defective Work for which it is responsible. If within the five-year correction period Owner discovers and does not promptly notify Vendor15 Days or give Vendor an opportunity to test or correct Defective Work as reasonably requested by Vendor, Owner waives Vendor's obligation to correct that Defective Work as well as Owner's right to claim a breach of the warranty with respect to that Defective Work. In no event shall this warranty cover any workmanship or materials outside the scope of Vendor's contract in connection with the Project. Under no circumstances shall the Vendor be expected or required to warrant or cure any workmanship or materials outside the scope of Work under this Agreement. The Owner and the Vendor waive consequential damages for all claims, disputes or other matters arising out of or relating to this Agreement.

3.9.2 With respect to any portion of Work first performed after Substantial Completion, the five-year correction period shall commence when that portion of the Work is finally complete. Correction periods shall not be extended by corrective work performed by Vendor.

3.9.3 If Vendor fails to correct or attempt to correct Defective Work within thirty (30) days after receipt of written notice from Owner before final payment, Owner may correct it in accordance with Owner's right to carry out the Work. In such case, an appropriate Change Order shall be issued deducting the cost of correcting the Defective Work from payments then or thereafter due Vendor. If payments then or thereafter due Vendor are not sufficient to cover such amounts, Vendor shall pay the difference to Owner.
3.9.4 Vendor's obligations and liability, if any, with respect to any Defective Work discovered after the five-year correction period shall be determined by the Law. If, after the five-year correction period but before the applicable limitation period has expired, Owner discovers any Work which Owner considers Defective Work, Owner shall, unless the Defective Work requires emergency correction, promptly notify Vendor and allow Vendor an opportunity to correct the Work if Vendor elects to do so. If Vendor elects to correct the Work, it shall provide written notice of such intent within fourteen (14) Days of its receipt of notice from Owner and shall complete the correction of Work within a mutually agreed timeframe. If Vendor does not elect to correct the Work, Owner may have the Work corrected by itself or others, and, if Owner intends to seek recovery of those costs from Vendor, Owner shall promptly provide Vendor with an accounting of actual correction costs.

3.9.5 If Vendor's correction or removal of Defective Work causes damage to or destroys other completed or partially completed Work or existing buildings, Vendor shall be responsible for the cost of correcting the destroyed or damaged property.

3.9.6 The five-year period for correction of Defective Work does not constitute a limitation period with respect to the enforcement of Vendor's other obligations under the Contract Documents.

3.9.7 Before final payment, at Owner and Vendor's mutual agreement, the parties may elect to accept Defective Work rather than require its removal and correction. In such case, the Contract Price shall be equitably adjusted for any diminution in the value of the Project caused by such Defective Work.

## 3.10 CORRECTION OF COVERED WORK

3.10.1 Upon issuance of an Interim Directive, Work that has been covered without a requirement that it be inspected before being covered shall be uncovered for Owner's inspection. Owner shall pay for the costs of uncovering and replacement if the Work proves to be in conformance with the Contract Documents, or if the defective condition was caused by Owner or Others. If the uncovered Work proves to be defective, Vendor shall pay the costs of uncovering and replacement.

3.10.2 If any Work is covered contrary to requirements in the Contract Documents, Owner may issue an Interim Directive to uncover the Work for Owner's observation and recover the Work all at Vendor's expense and with no Contract Time adjustment.

## 3.11 SAFETY

3.11.1 SAFETY PROGRAMS Vendor holds overall responsibility for safety programs. However, such obligation does not relieve Subcontractors their safety responsibilities and to comply with the Law. Vendor shall prevent against injury, loss, or damage to persons or property by taking reasonable steps to protect: (a) its employees and other persons at the Worksite; (b) materials and equipment stored onsite or offsite for use in the Work; and (c) property located at the Worksite and adjacent to work areas.

3.11.2 VENDOR'S SAFETY REPRESENTATIVE Vendor shall designate an individual at the Worksite in its employ as its safety representative. Unless otherwise identified by Vendor in writing to Owner, Vendor's project superintendent shall serve as its safety representative. Vendor shall report promptly in writing to Owner all recordable accidents and injuries occurring at the Worksite. When Vendor is required to file an accident report with a public authority, Vendor shall furnish a copy of the report to Owner.

3.11.3 Vendor shall provide Owner with copies of all notices required of Vendor by Law. Vendor's safety program shall comply with the requirements of authorities having jurisdiction.

3.11.4 Damage or loss not insured under property insurance which may arise from the Work, to the extent caused by the negligent or intentionally wrongful acts or omissions of Vendor, or anyone for whose acts Vendor may be liable, shall be promptly remedied by Vendor.
3.11.5 If Owner deems any part of the Work or Worksite unsafe, Owner, without assuming responsibility for Vendor's safety program, may require by Interim Directive, Vendor to stop performance of the Work, take corrective measures satisfactory to Owner, or both. If Vendor does not adopt corrective measures, Owner may perform them and deduct their cost from the Contract Price. Vendor agrees to make no claim for damages, for an increase in the Contract Price or Contract Time based on Vendor's compliance with Owner's reasonable request.

## 3.12 EMERGENCIES

3.12.1 In an emergency affecting the safety of persons or property, Vendor shall act in a reasonable manner to prevent threatened damage, injury, or loss.

### 3.12.2 MATERIALS BROUGHT TO THE WORKSITE

3.12.2.1 Safety Data Sheets (SDS) as required by Law and pertaining to materials or substances used or consumed in the performance of the Work, whether obtained by Vendor, Subcontractors, Owner, or Others, shall be maintained at the Worksite by Vendor and made available to Owner, Subcontractors, and Others.

3.12.2.2 Vendor shall be responsible for the proper delivery, handling, application, storage, removal, and disposal of all materials and substances brought to the Worksite by Vendor and used or consumed in the performance of the Work. Upon the issuance of the Certificate of Substantial Completion, Owner shall be responsible for materials and substances brought to the Worksite by Vendor if such materials or substances are required by the Contract Documents.

**Agreement VNA - WESTON**
Page 7 of 25

3.12.2.3 To the extent caused by the negligent or intentionally wrongful acts or omissions of Vendor, its agents, officers, directors, and employees, Vendor shall indemnify and hold harmless Owner, its agents, officers, directors, and employees, from and against any and all claims, damages, losses, costs, and expenses, including but not limited to attorneys' fees, costs, and expenses incurred in connection with any dispute resolution procedure, arising out of or relating to the delivery, handling, application, storage, removal, and disposal of all materials and substances brought to the Worksite by Vendor.

3.12.3 §3.12 in its entirety shall **survive the completion** of the Work or Agreement

termination. 3.13 SUBMITTALS

3.13.1 Vendor shall submit to Owner all shop drawings, samples, product data, and similar submittals required by the Contract Documents for review and approval. Submittals shall be submitted **in** electronic form **if** required by §4.5.1. Vendor shall be responsible for the accuracy and conformity of **its** submittals to the Contract Documents. At no additional cost, Vendor shall prepare and deliver its submittals **in a** manner consistent with the Schedule of the Work and in such time and sequence so as **not to delay** the performance of the Work or the work of Owner and Others. Vendor submittals shall identify in writing for each submittal all changes, deviations, or substitutions from the requirements of the Contract Documents. The approval of any Vendor submittal shall not be deemed to authorize changes, deviations, or substitutions from the requirements of the Contract Documents unless a Change Order or Interim Directive specifically authorizes such deviation, substitution, or change. To the extent a change, deviation, or substitution causes an impact to the Contract Price or Contract Time, such approval shall be memorialized in a Change Order no later than seven (7) Days following approval by Owner. Owner shall not make any change, deviation, or substitution through the submittal process without specifically identifying and authorizing such deviation to Vendor. If the Contract Documents do not contain submittal requirements pertaining to the Work, Vendor agrees upon request to submit in a timely fashion to Design Professional and Owner for review any shop drawings, samples, product data, manufacturers' literature, or similar submittals as may reasonably be required by Owner.

9

**3.13.2**
Owner shall be responsible for review and approval of submittals with reasonable promptness to avoid causing delay.

**3.13.3** Vendor shall perform all Work strictly in accordance with approved submittals. Approval of shop drawings is not an authorization to perform changed work, unless the procedures of ARTICLE 8 are followed. Approval does not relieve Vendor from responsibility for Defective Work resulting from errors or omissions on the approved shop drawings.

**3.13.4** Record copies of the following, incorporating field changes and selections made during construction, shall be accessible at the Worksite and available to Owner upon request: drawings, specifications, addenda, Change Order and other modifications, and required submittals including product data, samples, and shop drawings.

**3.13.5** Vendor shall prepare and submit to Owner:

❑ everything which is mentioned in Exhibit C and D

**3.14 DESIGN DELEGATION** If the Contract Documents specify that Vendor is responsible for the design of a particular system or component to be incorporated into the Project, then Owner shall specify all required performance and design criteria. Vendor shall not be responsible for the adequacy of such performance and design criteria.

As required by the Law, **Vendor shall procure design services and certifications necessary to satisfactorily** complete the Work from a licensed design professional. The signature and seal of Vendor's design professional shall appear on all drawings, calculations, specifications, certifications, shop drawings, and other submittals related to the Work designed or **certified by Vendor's** design professional.

**3.15 WORKSITE CONDITIONS**

**3.15.1 WORKSITE VISIT Vendor acknowledges that it has visited, or has had the opportunity to visit, the Worksite to visually inspect the general and local conditions which could affect the Work.**

**3.15.2 CONCEALED OR UNKNOWN SITE CONDITIONS** If a condition encountered at the Worksite is (a) subsurface **or other physical condition** materially different from those indicated in the Contract Documents, or (b) unusual and unknown physical condition materially different from conditions ordinarily encountered and generally recognized as inherent in Work provided for in the Contract Documents, Vendor shall stop affected Work after the concealed or unknown condition is first observed **and give prompt written notice of the condition to Owner. Owner shall investigate and then** issue an Interim Directive specifying the extent to which Owner agrees that a concealed or unknown condition exists **and directing how Vendor is to** proceed. Vendor shall not be required to perform any Work relating to the condition without the written mutual agreement of the Parties. Any change in the Contract Price or the Contract Time as a result of the condition, including any dispute about its existence or nature, shall be determined as provided in ARTICLE 8.

**3.16 PERMITS AND TAXES**

**3.16.1** Vendor shall give public authorities all notices required by Law and, except for permits and fees that are the responsibility of Owner, shall obtain and pay for all necessary licenses and renewals pertaining to the Work. Vendor shall provide to Owner copies of all notices, licenses, and renewals required under the Contract Documents.

**3.16.2** Vendor shall pay applicable taxes for the Work provided by Vendor.
If, in accordance with Owner's direction, Vendor claims an exemption for taxes, Owner shall indemnify and hold Vendor harmless from any liability, penalty, interest, fine, tax assessment, attorneys' fees, or other expense or cost incurred by Vendor as a result of any such claim.

**3.17 CLEAN UP**

**3.17.1** At Vendor's own expense, Vendor shall regularly remove debris and waste materials at the Worksite resulting from the Work. Before discontinuing Work in an area, Vendor shall clean the area and remove all rubbish and its construction equipment, tools, machinery, waste, and surplus materials. Vendor shall minimize and confine dust and debris resulting from construction activities. At the completion of the Work, Vendor shall remove from the Worksite all construction equipment, tools,

surplus materials, waste materials, and debris.

3.17.2 If Vendor fails to commence compliance with cleanup duties within five (5) Business Days after written notification from Owner of non-compliance, Owner may implement appropriate cleanup measures without further notice and shall deduct the reasonable costs from any amounts due or to become due to Vendor in the next payment period.

3.18 ACCESS TO WORK Vendor shall facilitate the access of Owner, Design Professional, and Others to Work in progress.

3.19 COMPLIANCE WITH THE LAW Vendor shall comply with the Law at its own cost. Vendor shall be liable to Owner for all loss, cost, or expense attributable to any acts or omissions by Vendor, its employees, subcontractors, suppliers, and agents for failure to comply with the Law, including fines, penalties, or corrective measures. However, liability under this subsection shall not apply if prior approval by appropriate authorities and Owner is received.

3.19.1 The Contract Price or Contract Time may be equitably adjusted by Change Order for additional costs or time needed resulting from any change in Law, including increased taxes, enacted after the date of this Agreement.

3.20  CONFIDENTIALITY The Vendor and all its affiliates shall treat all business and trade secrets and Confidential Information of Owner and its affiliates, which are known to them in connection with the cooperation, including the initiation and execution of the Agreement and Contract Documents, strictly confidential. This applies, in particular, to all data, plans, and other information regarding the conception, design, and operation of the plant, which are accessible to them during the execution of the Project. The transfer to third parties or the exploitation of the information in projects for other companies is strictly prohibited. Vendor's confidentiality obligations do not apply to disclosures to Subcontractors, Subsubcontractors, and Suppliers as long as those are necessary to get the Work regarding this Agreement done. Vendor shall assign the confidentiality clauses of this contract to its Subcontractors, Subsubcontractors and Suppliers. Owner shall treat as Confidential information of the Vendor's estimating systems and historical and parameter cost data that may be disclosed to Owner in performing the Work.

Confidentiality obligations do not supersede by Law, a governmental agency or authority an order of a court of competent jurisdiction or a validly issued subpoena. In such event a Party shall promptly notify that other Party to permit that Party's legal objection.

3.21  The duty of confidentiality applies at least for a period of five years after the termination of the Agreement, and expires, only if and to the extent, that the Confidential Information has become generally known. The receiving party is obliged to return or destroy the Confidential Information at the end of the Agreement, or to permanently delete any digital copies. In case of destruction or deletion, the receiving party shall at the request of the disclosing party immediately confirm in writing the destruction or deletion.3.22  If the receiving party recognizes that Confidential Information has been passed on to an unauthorized third party, or that a confidential document has been lost, it will immediately notify the disclosing party of the incident and provide information about the incident.

3.23

Employees involved in the execution of the Agreement shall be obliged in writing in accordance with the above duty of confidentiality

3.24 The receiving party shall not have the right to include photographic or artistic representations of the design of the Project among the receiving party's promotional and professional materials without disclosing party's prior written approval.

3.25 PROTECTION OF THE WORK Except as otherwise provided in Exhibit C, Vendor shall take necessary precautions to reasonably protect the Work and the work of others from damage caused by Vendor's operations. Should Vendor cause damage to the Work or property of Owner, Vendor, or others, Vendor shall promptly remedy such damage to the reasonable satisfaction of Owner, or Owner may, after forty-eight (48) hours' written notice to Vendor, remedy the damage and deduct its cost from any amounts due or to become due Vendor, unless such costs are recovered under applicable property insurance.

3.26 DELIVERY OF GOOD AND MATERIALS Vendor shall not make any partial deliveries of goods or materials without Owner's prior written approval. Any excess or short deliveries or other deviations from the

order shall be accepted by Owner only if Owner has given its written consent. The number and date of the order and the exact description of the goods or materials to be supplied must be indicated on all shipping and transportation documents.

## ARTICLE 4 OWNER'S RESPONSIBILITIES

4.1 INFORMATION AND SERVICES Owner's responsibilities under this article shall be fulfilled with reasonable detail and in a timely manner.

4.2 Intentionally Omitted.

4.3 WORKSITE INFORMATION To the extent Owner has obtained the following Worksite information, then Owner shall provide Vendor the following upon written request and if required for Vendor's performance of Work:

> 4.3.1 information describing the physical characteristics of the Worksite, including surveys, Worksite evaluations, legal descriptions, data or drawings depicting existing conditions, subsurface conditions, and environmental studies, reports, and investigations;

> 4.3.2 tests, inspections, and other reports dealing with environmental matters, Hazardous Material and other existing conditions, including structural, mechanical, and chemical tests, required by the Contract Documents or by Law;

> 4.3.3 the limits of Pollution Liability Insurance covering the Worksite held by Owner; and

> 4.3.4 any other information or services requested in writing by Vendor which are required for Vendor's performance of the Work and under Owner's control.

4.4 BUILDING PERMIT, FEES, AND APPROVALS Except for those permits and fees related to the Work which are specified in Exhibit C as the responsibility of Vendor, Owner shall secure and pay for all other permits (including building permit), approvals, easements, assessments, and fees required for the development, construction, use, or occupancy of permanent structures or for permanent changes in existing facilities, including the building permit.

4.5 CONTRACT DOCUMENTS Unless otherwise specified, Owner shall provide 2 hard copies of the Contract Documents to Vendor without cost.
> ELECTRONIC DOCUMENTS If Owner requires that Owner, Design Professional, and Vendor exchange documents and data in electronic or digital form, before any such exchange, Owner, Design Professional, and Vendor shall agree on and follow a written protocol governing all exchanges in a separate addenda, which, at a minimum, shall specify: (a) the definition of documents and data to be accepted in electronic or digital form or to be transmitted electronically or digitally; (b) management and coordination responsibilities; (c) necessary equipment, software, and services; (d) acceptable formats, transmission methods, and verification procedures; (e) methods for maintaining version control; (f) privacy and security requirements; and (g) storage and retrieval requirements. Except as otherwise agreed to by the Parties in writing, each Party shall bear its own costs as identified in the protocol. In the absence of a written protocol, use of documents and data in electronic or digital form shall be at the sole risk of the recipient.

4.6 OWNER'S REPRESENTATIVE Owner's Representative is Rand Dueweke, Chief Financial Officer, VNA Corporation, 625 Kenmoor Ave SE, Suite 301, Grand Rapids, MI 49546. Owner's Representative shall be fully acquainted with the Project, and shall have authority to bind Owner in all matters requiring Owner's approval, authorization, or written notice. If Owner changes its Representative or its Representative's authority, Owner shall immediately notify Vendor in writing.

4.7 OWNER'S CUTTING AND PATCHING Cutting, patching, or altering the Work **by** Owner or Others shall be done with the prior written approval of Vendor, which approval shall not be unreasonably withheld.

4.8 OWNER'S RIGHT TO CLEAN UP In case of a dispute between Vendor and Others with regard to respective responsibilities for clean up at the Worksite, Owner **may** implement appropriate cleanup measures after five (5) Business Days' notice and allocate the cost among those responsible during the following pay period.

**Agreement VNA - WESTON**
Page **11** of **25**



## ARTICLE 5 SUBCONTRACTS

### 5.1 AWARD OF SUBCONTRACTS AND OTHER CONTRACTS FOR PORTIONS OF THE WORK

5.1.1 Promptly after executing this Agreement, Vendor shall provide Owner with a written list of the proposed Subcontractors and significant Suppliers. If Owner has a reasonable objection to any proposed Subcontractor or Supplier, Owner shall notify Vendor in writing within two (2) business Days. Failure to promptly object shall constitute acceptance.

5.1.2 If Owner has reasonably and promptly objected, Vendor shall not contract with the proposed Subcontractor or Supplier, and Vendor shall propose another acceptable Subcontractor or Supplier to Owner. An appropriate Change Order may reflect any increase or decrease in the Contract Price or Contract Time because of the substitution.

5.2 BINDING OF SUBCONTRACTORS AND SUPPLIERS Vendor agrees to bind every Subcontractor and Supplier (and require each Subcontractor to so bind its subcontractors and significant suppliers) to the Contract Document's applicable provisions to that portion of the Work.

5.3 CONTINGENT ASSIGNMENT OF SUBCONTRACTS

If this Agreement is terminated, each subcontract and supply agreement shall be assigned by Vendor to Owner, subject to the prior rights of any surety, provided that: (a) this Agreement is terminated by Owner pursuant to §11.2 or §11.3; and

(b) Owner accepts such assignment after termination by notifying Vendor and Subcontractor or Vendor and Supplier in writing, and assumes all rights and obligations of Vendor pursuant to each subcontract or supply agreement.

## ARTICLE 6 TIME

6.1 DATE OF COMMENCEMENT The Date of Commencement is the date of the order.

6.1.1 FINAL COMPLETION of the Work shall be achieved no later than October 31,.2019 , if the ownehas sent a written order no later than February 04, 2019

6.1.2 FIRST DOCUMENTATION which is mentioned in Exhibits C and D
shall be achieved no later than March 15, 2019

The Owner shall have two weeks for checking the first documentation. 6.1.3

Time is of the essence with regard to the obligations of the Contract Documents.

6.1.4 Unless instructed by Owner in writing, Vendor shall not knowingly commence the Work before the effective date of Vendor's required insurance.

6.2 SCHEDULE OF THE WORK

6.2.1 Before submitting its first application for payment, Vendor shall submit to Owner, a Schedule of the Work showing the dates on which Vendor plans to begin and complete various parts of the Work, including dates on which information and approvals are required from Owner. Except as otherwise directed by Owner, Vendor shall comply with the approved Schedule of the Work. Unless otherwise agreed, the Schedule of the Work shall be formatted in a detailed precedence-style critical path method that (a) provides a graphic representation of all activities and events, including float values that will affect the critical path of the Work, and (b) identifies dates that are critical to ensure timely and orderly completion of the Work. Vendor shall update the Schedule of the Work on a monthly basis or as mutually agreed by the Parties.

6.2.2 Owner may determine the sequence in which the Work shall be performed, provided it does not unreasonably interfere with the Schedule of the Work. Owner may require Vendor to make reasonable changes in the sequence at any time during the performance of the Work in order to facilitate the performance of work by Owner or Others. If Vendor consequently incurs costs or is delayed, or both, Vendor may seek an equitable adjustment in the Contract Price or Contract Time under ARTICLE 8.

6.3 DELAYS AND EXTENSIONS OF TIME

6.3.1 NOTICE OF DELAYS If delays to the Work are encountered for any reason, Vendor shall provide written notice to Owner within five (5) days of the cause of such delays after Vendor first recognizes the delay. The Parties each agree **to take reasonable** steps to mitigate the effect of such delays.

6.4 NOTICE OF DELAY CLAIMS If Vendor requests an equitable extension of the Contract Time or an equitable adjustment in the Contract Price as a **result of** a delay described in §6.3, Vendor shall give Owner written notice of the claim **in** accordance with §8.4. If Vendor causes delay in the completion of the Work, Owner shall be entitled to recover **its** additional costs subject to §. Owner shall process any such claim against Vendor in accordance with ARTICLE 8.

6.5 LIQUIDATED DAMAGES

6.5.1 FINAL COMPLETION Liquidated damages based on the Final Completion date shall apply.

6.5.2 Owner **will** suffer damages which are difficult to determine and accurately specify if the Final Completion date, **as** may be amended by subsequent Change Order, is not attained. Vendor shall pay Owner 0.15% **of the** Contract Price as liquidated damages and not as a penalty for each Day that Final Completion extends beyond the Final Completion date. The liquidated damages are limited up to 5% of the contract price.

6.5.3 The FIRST DOCUMENTATION in accordance to 6.1.2 is also a part of liquidated damages. The FIRST DOCUMENTATION shall be delivered electronically to the Owner based under the conditions that the soil report will be provided until February 21.

### ARTICLE 7 PRICE

7.1 LUMP SUM Lump sum is the Contract Price of thirteen million four hundred thousand  US dollars ($13.400.000,00) subject to adjustment as provided in this Agreement.

### ARTICLE 8 CHANGES

Changes in the Work that are within the general scope of the Contract Documents shall be accomplished, without invalidating this Agreement, by Change Order and Interim Directive.

8.1 CHANGE ORDER

8.1.1 Vendor may request or Owner may order changes in the Work or the timing or sequencing of the Work that impact the Contract Price or the Contract Time. All such changes in the Work that affect Contract Time or Contract Price shall be formalized in a Change Order and processed in accordance with this article.

8.1.2 For changes in the Work, the Parties shall negotiate an appropriate adjustment to the Contract Price or the Contract Time in good faith and conclude negotiations as expeditiously as possible. Acceptance of the Change Order and any adjustment in the Contract Price or Contract Time shall not be unreasonably withheld.

8.1.3 NO OBLIGATION TO **PERFORM** Vendor shall not be obligated to perform changes in the Work without a Change Order or Interim Change Directive.

8.2 INTERIM DIRECTIVES

8.2.1 Owner **may issue** an Interim Directive directing a change in the Work before agreeing on an adjustment **to** Contract Price or Contract Time, or directing Vendor to perform Work that Owner believes is not a change. **If the Parties** disagree that the Interim Directed work is within the scope of the Work, Vendor shall perform the disputed Work and furnish Owner with an estimate of the costs to perform the disputed work in accordance with Owner's interpretations.

8.2.2 The Parties shall negotiate expeditiously and in good faith for appropriate adjustments, as applicable, to the **Contract** Price or the Contract Time arising out of an Interim Directive. As the directed Work is performed, Vendor shall submit its costs for such Work with its application for payment beginning with the next application for payment within thirty (30) Days of the issuance of the Interim Directive. Undisputed amounts may be included in applications for payment and shall be paid by Owner in accordance with this Agreement.

8.2.3 Directing Vendor to perform Work that Owner believes is not a change. If the Parties disagree that the Interim Directed work is within the scope of the Work, Vendor shall perform the disputed Work and furnish Owner with an estimate of the costs to perform the disputed work in accordance with Owner's interpretations.

8.2.4 When the Parties agree upon the adjustment in the Contract Price or the Contract Time, for a change in the Work directed by an Interim Directive, such agreement **shall** be the subject of a Change Order. The Change Order shall include all outstanding Interim Directives on which The Parties have reached agreement on Contract Price or Contract Time issued since the last Change Order.

8.3 DETERMINATION OF COST

8.3.1 An increase or decrease in the Contract Price resulting from a change in the Work shall be determined by one or more of the following methods:

8.3.2 unit prices set forth in the Contract Documents or as subsequently agreed;

8.3.3 a mutually accepted, itemized lump sum; or

8.3.4 COST OF THE WORK Cost of the Work as defined by this §8.3.4 plus 15% for Overhead and 5% for profit. "Cost of the Work" shall include the following costs reasonably incurred to perform a

**Agreement VNA - WESTON**
Page **14** of **25**

change in the Work:

    8.3.4.1 Labor wages directly employed by Vendor performing the Work;

    8.3.4.2 Salaries of Vendor's employees when stationed at the field office to the extent necessary to complete the applicable Work, employees engaged on the road expediting the production or transportation of material and equipment, and supervisory employees from the principal or branch office as mutually agreed by the Parties in writing;

    8.3.4.3 Cost of applicable employee benefits and taxes, including but not limited to, workers' compensation, unemployment compensation, social security, health, welfare, retirement, and other fringe benefits as required by law, labor agreements, or paid under Vendor's standard personnel policy, insofar as such costs are paid to employees of Vendor who are included in the Cost of the Work in §8.3.4.1 and §8.3.4.2;

    8.3.4.4 Reasonable transportation, travel, and hotel expenses of Vendor's personnel incurred in connection with the Work;

    8.3.4.5 **Cost of** all materials, supplies, and equipment incorporated in the Work, including costs of inspection and testing if not provided by Owner, transportation, storage, and handling;

    8.3.4.6 Payments made by Vendor to Subcontractors for performed Work;

    8.3.4.7 Cost, including transportation and maintenance of all materials, supplies, equipment, temporary facilities, and hand tools not owned by the workers that are used or consumed in the performance of the Work, less salvage value or residual value; and cost less salvage value of such items **used,** but not consumed that remain the property of Vendor;

    8.3.4.8 Rental charges of all necessary machinery and equipment, exclusive of hand tools owned by workers, used at the Worksite, whether rented from Vendor or others, including installation, repair and replacement, dismantling, removal, maintenance, transportation, and delivery costs. Rental from unrelated third parties shall be reimbursed at actual cost. Rentals from Vendor or its affiliates, subsidiaries, or related parties shall be reimbursed at the prevailing rates in the locality of the Worksite up to eighty-five percent (85%) of the value of the piece of equipment;

    8.3.4.9 Cost of the premiums for all insurance and surety bonds which Vendor is required to procure or deems necessary, and approved by Owner including any additional premium incurred as a result of any increase in the cost of the Work;

    8.3.4.10 Sales, use, gross receipts, or other taxes, tariffs, or duties related to the Work for which Vendor is liable;

    8.3.4.11 Permits, fees, licenses, tests, and royalties;

    8.3.4.12 Losses, expenses, or damages to the extent not compensated by insurance or otherwise, and the cost of corrective work, provided that such did not arise from Vendor's negligence,

    8.3.4.13 Water, power, and fuel costs necessary for the changed Work;

    8.3.4.14 Cost of removal of all nonhazardous substances, debris, and waste materials;

    8.3.4.15 Costs directly incurred to perform a change in the Work which are reasonably inferable from the Contract Documents for the changed Work;

    8.3.4.16 DISCOUNTS All discounts for prompt payment shall accrue to Owner to the extent such payments are made directly by Owner. To the extent payments are made with funds of Vendor, all cash discounts shall accrue to Vendor. All trade discounts, rebates, and refunds, and all returns from sale of surplus materials and equipment, shall be credited to the Cost of the Work;

    8.3.4.17 COST REPORTING Vendor shall maintain complete and current records that comply with generally accepted accounting principles and calculate the Cost of Work. Owner shall be

afforded access to Vendor's records, books, correspondence, instructions, drawings, receipts, vouchers, memoranda, and similar data relating to requested payment for Cost of the Work. Vendor shall preserve all such records for a period of three years after the final payment or longer where required by Law;

8.3.4.18 COST AND SCHEDULE ESTIMATES Vendor shall use reasonable skill and judgment in the preparation of a cost estimate or schedule for a change to the Work, but does not warrant or guarantee their accuracy.

8.4 CHANGES NOTICE Except as provided in §6.3 and §6.4 for any claim for an increase in the Contract Price or the Contract Time, Vendor shall give Owner written notice of the claim within five (5) Days after the occurrence giving rise to the claim or within five (5) Days after Vendor first recognizes the condition giving rise to the claim, whichever is later. Except in an emergency, notice shall be given before proceeding with the Work. Thereafter, Vendor shall submit written documentation of its claim, including appropriate supporting documentation, within fourteen (14) Days after giving notice, unless the Parties mutually agree upon a longer period of time. Owner shall respond in writing denying or approving Vendor's claim no later than fourteen (14) Days after receipt of Vendor's claim. Owner's failure to so respond shall be deemed a denial of the claim. Any change in the Contract Price or the Contract Time resulting from such claim shall be authorized by Change Order.

8.5 INCIDENTAL CHANGES Owner may direct Vendor to perform incidental changes in the Work, upon concurrence with Vendor that such changes do not involve adjustments in the Contract Price or Contract Time. Incidental changes shall be consistent with the scope and intent of the Contract Documents. Owner shall initiate an incidental change in the Work by issuing an Interim Directive.

## ARTICLE 9 PAYMENT

9.1 PROGRESS PAYMENTS

9.1.1 APPLICATIONS

The terms of payment are in accordance with the Exhibit E.

9.1.2 Owner shall pay the amount no later than thirty (30) Days after accepting such application. Owner may deduct from any progress payment amounts that may be retained pursuant to this Agreement.

9.1.3 STORED MATERIALS AND EQUIPMENT Unless otherwise provided in the Contract Documents, applications for payment may include materials and equipment not yet incorporated into the Work but delivered to and suitably stored onsite or offsite including applicable insurance, storage, and costs incurred transporting the materials to an offsite storage facility. Approval of payment applications for stored materials and equipment stored offsite shall be conditioned on a submission by Vendor of bills of sale and proof of required insurance, or such other documentation satisfactory to Owner to establish the proper valuation of the stored materials and equipment, Owner's title to such materials and equipment, and to otherwise protect Owner's interests therein, including transportation to the Worksite.

9.1.4 LIEN WAIVERS AND LIENS

9.1.4.1 PARTIAL LIEN WAIVERS AND AFFIDAVITS If required by Owner as a prerequisite for payment, Vendor shall provide a partial lien and claim waiver in the amount of the application for payment and affidavits from its Subcontractors and Suppliers for the completed Work. Such waivers shall be conditional upon payment. Vendor shall not be required to sign an unconditional waiver of lien or claim, before receiving payment or in an amount in excess **of what** it has **been paid.**

**9.1.4.2 REMOVING LIENS** If Owner has made payments in the time required by this ARTICLE **9, Vendor** shall, within thirty (30) Days after filing, remove any liens filed against **the** premises or public improvement fund by any party or parties performing labor or services or supplying materials in connection with the Work. If Vendor fails to take such action on a lien, Owner may cause the lien to be removed at Vendor's expense, including bond **costs** and reasonable attorneys' fees. This subsection shall not apply if there is a dispute **pursuant to** ARTICLE 12 relating to the subject matter of the lien.

9.2 ADJUSTMENT OF VENDOR'S PAYMENT APPLICATION Owner may adjust or reject a payment application or nullify a previously approved payment application, in whole or in part, as may reasonably be necessary to protect Owner from loss or damage based upon the following, to the extent that Vendor is responsible under the Contract Documents:

9.2.1 Vendor's repeated failure to perform the Work as required by the Contract Documents;

9.2.2 Except as accepted by the insurer providing Builder's Risk or other property insurance covering the project, loss or damage arising out of or relating to the Contract Documents and caused by Vendor to Owner or to others to whom Owner may be liable;

9.2.3 Vendor's failure to properly pay either Subcontractors or Suppliers following receipt of payment from Owner for that portion of the Work or for supplies, provided that Owner is making payments to Vendor in accordance with the Contract Documents;

9.2.4 rejected or Defective Work not corrected in a timely fashion;

9.2.5 reasonable evidence of delay in performance of the Work such that the Work will not be completed within the Contract Time;

9.2.6 reasonable evidence demonstrating that the unpaid balance of the Contract Price is insufficient to fund the cost to complete the Work; and

9.2.7 uninsured third-party claims involving Vendor, or reasonable evidence demonstrating that third-party claims are likely to be filed unless and until Vendor furnishes Owner with adequate security in the form of a surety bond, letter of credit, or other collateral or commitment sufficient to discharge such claims if established.

No later than seven (7) Days after receipt of an application for payment, Owner shall give written notice to Vendor, at the time of disapproving or nullifying all or part of an application for payment, stating its specific reasons for such disapproval or nullification, and the remedial actions to be taken by Vendor in order to receive payment. When the above reasons for disapproving or nullifying an application for payment are removed, payment will be promptly made for the amount previously withheld.

9.3 ACCEPTANCE OF WORK Neither Owner's payment of progress payments nor its partial or full use or occupancy of the Project constitutes acceptance of Work not complying with the Contract Documents.

9.4 FINAL COMPLETION

9.4.1 Vendor shall notify Owner when it considers Final Completion of the Work or a designated portion to have been achieved. Owner shall promptly conduct an inspection to determine whether the Work or designated portion can be occupied or used for its intended use by Owner without excessive interference in completing any remaining unfinished Work. If Owner determines that the Work or designated portion has not reached Final Completion, Owner shall promptly compile a list of items to be completed or corrected so Owner may occupy or use the Work or designated portion for its intended use. Vendor shall promptly complete all items on the list.

9.4.2 When Final Completion of the Work or a designated portion is achieved, Vendor shall prepare a Certificate of Final Completion establishing the date of Final Completion and the respective responsibilities of each Party for interim items such as security, maintenance, utilities, insurance, and damage to the Work. In the absence of a clear delineation of responsibilities, Owner shall assume all responsibilities for items such as security, maintenance, utilities, insurance, and damage to the Work. The Certificate of Final Completion shall also list any items to be completed or corrected, and establish the time for their completion or correction. The Certificate of Final Completion shall be submitted by Vendor to Owner for written acceptance of responsibilities assigned in the Certificate of Final Completion.

9.4.3 Unless otherwise provided in the Certificate of Final Completion, warranties required by the Contract Documents shall commence on the date of Final Completion of the Work or a designated portion.

9.4.4 Upon Owner's written acceptance of the Certificate of Final Completion, Owner shall pay to Vendor the remaining payments as defined in §9.1 n, less a sum equal to one hundred fifty percent (150%) of the estimated cost of completing or correcting remaining items on that part of the Work, as agreed to by the Parties as necessary to achieve Final Completion. Uncompleted items shall be

completed by Vendor in a mutually agreed upon timeframe. Owner shall pay Vendor monthly the amount retained for unfinished items as each item is completed.

## 9.5 PARTIAL OCCUPANCY OR USE

9.5.1 Owner may occupy or use completed or partially completed portions of the Work when (a) the portion of the Work is designated in a Certificate of Final Completion, (b) appropriate insurer(s) consent to the occupancy or use, and (c) appropriate public authorities authorize the occupancy or use. Such partial occupancy or use shall constitute Final Completion of that portion of the Work.

## 9.6 FINAL COMPLETION AND FINAL PAYMENT

9.6.1 Upon notification from Vendor that the Work is complete and ready for final inspection and acceptance, Owner shall promptly conduct an inspection to determine if the Work has been completed and is acceptable under the Contract Documents.

9.6.2 When Final Completion has been achieved, Vendor shall prepare for Owner's written acceptance a final application for payment stating that to the best of Vendor's knowledge, and based on Owner's inspections, the Work has reached Final Completion in accordance with the Contract Documents.

9.6.3 Final payment of the balance of the Contract **Price shall be** made to Vendor within twenty (20) Days after Vendor has submitted a complete and accurate application for final payment, including submissions required under §9.6.4, and **a Certificate of Final Completion has been executed by the** Parties.

9.6.4 Final payment is due upon Vendor's submission **to Owner** of the following:

9.6.4.1 An affidavit **declaring any indebtedness** connected with the Work to have been paid, satisfied, or to be **paid** with the proceeds of final payment, so as not to encumber Owner's property;

9.6.4.2 As-built drawings, manuals, copies of warranties, and all other close-out documents required **by the** Contract Documents;

9.6.4.3 Release of **any** liens, conditioned on final payment being received;

9.6.4.4 Consent of any surety; and

9.6.4.5 Any outstanding known and unreported accidents or injuries experienced by Vendor or its Subcontractors **at the Worksite.**

9.6.5 VENDOR ACCEPTANCE OF FINAL PAYMENT Unless Vendor provides written identification of unsettled claims with an application for final payment, its acceptance of final payment constitutes a waiver of such claims.

## ARTICLE 10 INDEMNITY, INSURANCE, AND BONDS

## 10.1 INDEMNITY

10.1.1 To the fullest extent permitted by law, Vendor shall indemnify and hold harmless Owner, Owner's officers, directors, members, consultants, agents, and employees from all claims for bodily injury and property damage, other than to the Work itself and other property insured, including reasonable attorneys' fees, costs and expenses, that may arise from the performance of the Work, but only to the extent caused by the negligent acts or omissions of Vendor, Subcontractors, Suppliers, Subsubcontractors, or anyone employed directly or indirectly by any of them or by anyone for whose acts any of them may be liable. Vendor shall be entitled to reimbursement of any defense costs paid above Vendor's percentage of liability for the underlying claim.

10.1.2 Intentionally omitted.

10.1.3 NO LIMITATION ON LIABILITY In any and all claims against the Indemnitees by any employee of Vendor, anyone directly or indirectly employed by Vendor or anyone for whose acts Vendor may be liable, the indemnification obligation shall not be limited in any way by any limitation on the amount or type of damages, compensation, or benefits payable by or for Vendor under workers' compensation acts, disability benefit acts, or other employment benefit acts.

**Agreement VNA - WESTON**
Page **18** of **25**

10.1.4 To the fullest extent permitted by law, Owner and its affiliates shall indemnify and hold harmless Vendor, Vendor's officers, directors, members, consultants, agents, and employees, Design Professional, and Others (the Indemnitees) from all claims for bodily injury and property damage, other than to the Work itself and other property insured, including reasonable attorneys' fees, costs and expenses, that may arise from the performance of the Work, but only arising out of the gross negligence or wrongful misconduct of Owner and its affiliates, Subcontractors, Suppliers, Subsubcontractors, or anyone employed directly or indirectly by any of them or by anyone for whose acts any of them may be liable. Owner and its affiliates shall be entitled to reimbursement of any defense costs paid above Owner's and its affiliate's percentage of liability for the underlying claim.

## 10.2 INSURANCE

10.2.1 Before starting the Work and as a condition precedent to payment, Vendor shall procure and maintain in force Workers' Compensation Insurance, Employers' Liability Insurance, Business Automobile Liability Insurance, and Commercial General Liability Insurance (CGL). The CGL policy shall include coverage for liability arising from premises, operations, independent contractors, products-completed operations, personal injury and advertising injury, contractual liability, and broad form property damage. Vendor shall maintain completed operations liability insurance for one year after Substantial Completion, or as required by the Contract Documents, whichever is longer. Vendor's Employers' Liability, Business Automobile Liability, and CGL policies, shall be written with at least the following limits of liability:

> 10.2.1.1 Employers' Liability Insurance
> > (a) $1,000,000 bodily injury by accident per accident.
> > (b) $1,000,000 bodily injury by disease policy limit.
> > (c) $1,000,000 bodily injury by disease per employee.

> 10.2.1.2 Business Automobile Liability Insurance $1,000,000 per accident.

> 10.2.1.3 Commercial General Liability Insurance
> > (a) $1,000,000 per occurrence.
> > (b) $2,000,000 general aggregate.
> > (c) $2,000,000 products/completed operations aggregate.
> > (d) $1,000,000 personal and advertising injury limit.

10.2.2 Employers' Liability, Business Automobile Liability, and CGL coverage required under §10.2.1 may be provided by a single policy for the full limits required or by a combination of underlying policies with the balance provided by excess or umbrella liability policies.

10.2.3 Vendor shall maintain in effect all insurance coverage required under §10.2.1 with insurance companies lawfully authorized to do business in the jurisdiction in which the Project is located. If Vendor fails to obtain or maintain any insurance coverage required under this Agreement, Owner may purchase such coverage and charge the expense to Vendor, or terminate this Agreement.

10.2.4 To the extent commercially available to Vendor from its current insurance company, insurance policies required under §10.2.1 shall contain a provision that the insurance company or its designee must give Owner written notice transmitted in paper or electronic format: (a) 30 Days before coverage is nonrenewed by the insurance company and (b) within 10 Business Days after cancelation of coverage by the insurance company. Before commencing the Work and upon renewal or replacement of the insurance policies, Vendor shall furnish Owner with certificates of insurance until one year after Substantial Completion or longer if required by the Contract Documents. In addition, if any insurance policy required under §10.2.1 is not to be immediately replaced without lapse in coverage when it expires, exhausts its limits, or is to be cancelled, Vendor shall give Owner prompt written notice upon actual or constructive knowledge of such condition.

## 10.3 PROPERTY INSURANCE

10.3.1 Unless otherwise directed in writing by Owner, before starting the Work, Owner shall obtain and maintain a Builder's Risk Policy upon the entire Project for the full cost of replacement at the time of loss, including existing structures. This insurance shall also: (a) name Vendor, Subcontractors, Subsubcontractors, Suppliers, and Design Professional as insureds; (b) be written in such form as to cover all risks of physical loss except those specifically excluded by the policy; and (c) insure at least against and not exclude:

**Agreement VNA - WESTON**
Page 19 of 25

10.3.1.1 the perils of fire, lightning, explosion, windstorm, hail, smoke, aircraft (except aircraft, including helicopter, operated by or on behalf of the Contractor) and vehicles, riot and civil commotion, theft, vandalism, malicious mischief, debris removal, flood, earthquake, earth movement, water damage, wind damage, testing if applicable, collapse however caused;

10.3.1.2 damage resulting from defective design, workmanship, or material;

10.3.1.3 coverage **extension for damage to** existing buildings, plant, or other structures at the Worksite, when the **Project is** contained within or attached to such existing buildings, plant, or structures. **Coverage shall be** to the extent loss or damage arises out of Vendor's activities or operations at the Project;

10.3.1.4 equipment breakdown, including mechanical breakdown, electrical injury to electrical devices, explosion of steam equipment, and damage to steam equipment caused by a condition within the equipment;

10.3.1.5 testing coverage for running newly installed machinery and equipment at or beyond the specified limits of their capacity to determine whether they are fit for their intended use; and

10.3.1.6 physical loss resulting from Terrorism.

10.3.2 The Party that is the primary cause of a Builder's Risk Policy claim shall be responsible for any deductible amounts or coinsurance payments. If no Party is the primary cause of a claim, then the Party obtaining and maintaining the Builder's Risk Policy pursuant to §10.3.1 shall be responsible for the deductible amounts or coinsurance payments. This policy shall provide for a waiver of subrogation. This insurance shall remain in effect until final payment has been made or until no person or entity other than Owner has an insurable interest in the property to be covered by this insurance, whichever is sooner. Partial occupancy or use of the Work shall not commence until Vendor has secured the consent of the insurance company or companies providing the coverage required in this subsection. Before commencing the Work, Vendor shall provide a copy of the property policy or policies obtained in compliance with §10.3.1

10.3.3 If Owner elects to purchase the property insurance required by this Agreement, including all of the same coverages and deductibles for the same duration specified in §10.3.1, then Owner shall give written notice to Vendor before the Work is commenced and provide a copy of the property policy or policies obtained in compliance with §10.3.1. Owner may then provide insurance to protect its interests and the interests of the Vendor, Subcontractors, Suppliers, and Subsubcontractors. If Owner gives written notice of its intent to purchase property insurance required by this Agreement and fails to purchase or maintain such insurance, Owner shall be responsible for costs reasonably attributed to such failure.

10.3.4 The Parties each waive all rights against each other and their respective employees, agents, contractors, subcontractors, suppliers, subsubcontractors, and design professionals for damages caused by risks covered by the property insurance except such rights as they may have to the proceeds of the insurance.

10.3.5 To the extent of the limits of Vendor's CGL specified in §10.2.1, whichever is more, Vendor shall indemnify and hold harmless Owner against any and all liability, claims, demands, damages, losses, and expenses, including attorneys' fees, in connection with or arising out of any damage or alleged damage to any of Owner's existing adjacent property that may arise from the performance of the Work, to the extent caused by the negligent or intentionally wrongful acts or omissions of Vendor, Subcontractor, Supplier, Subsubcontractor, or anyone employed directly or indirectly by any of them or by anyone for whose acts any of them may be liable.

10.3.6 RISK OF LOSS Except to the extent a loss is covered by applicable insurance, risk of loss from damage to the Work shall be upon the Party obtaining and maintaining the Builder's Risk Policy pursuant to section 10.3.1 until the Date of Final Completion.

10.4 ADDITIONAL GENERAL LIABILITY COVERAGE Owner shall not require Vendor to purchase and maintain additional liability coverage. If required, Vendor shall provide:

10.4.10Additional Insured. Owner shall be named as an additional insured on Vendor's CGL specified for on-going operations and completed operations, excess/umbrella liability, commercial automobile liability, and any required pollution liability, but only with respect to liability for bodily

injury, property damage, or personal and advertising injury to the extent caused by the negligent acts or omissions of Vendor, or those acting on Vendor's behalf, in the performance of Vendor's Work for Owner at the Worksite. The insurance (both primary and excess) of the Vendor and its Subcontractors shall be primary and non-contributory to any insurance available to the Additional Insureds.

10.5 ROYALTIES, PATENTS, AND COPYRIGHTS Vendor shall provide written notice to Owner in the event it is required to utilize any of Owner's patented or copyrighted materials, methods or systems and Vendor shall pay all royalties and license fees which may be due on the inclusion of any patented or copyrighted materials, methods, or systems selected by Vendor and incorporated in the Work. Vendor shall defend, indemnify, and hold Owner harmless from all suits or claims for infringement of any patent rights or copyrights arising out of such selection.

10.6 BONDS Performance and Payments bonds are required. Such bonds shall be issued by a surety admitted in the state in which the Project is locate, comply with the Law, must be acceptable to Owner and in the format of Exhibits 0 and R. Owner's acceptance shall not be withheld without reasonable cause. The penal sum of the bonds shall each be one hundred percent (100%) of the original Contract Price. Vendor shall endeavor to keep its surety advised of changes potentially impacting the Contract Time and Contract Price, though Vendor shall require that its surety waives any requirement to be notified of any alteration or extension of time.

### ARTICLE 11 SUSPENSION, NOTICE TO CURE, AND TERMINATION

11.1 SUSPENSION BY OWNER FOR CONVENIENCE

11.1.1 OWNER SUSPENSION Should Owner **order** Vendor in writing to suspend, delay, or interrupt the performance of the Work for the convenience of **Owner** and not due to any act or omission of Vendor or any person or entity for whose acts or omissions Vendor may be liable, then Vendor shall immediately suspend, delay, **or interrupt that portion** of the Work for the time period ordered by Owner. Owner will be responsible for any of the Vendor's indirect or direct losses or damages arising out of such delay or suspension.

11.1.2 Any action taken by Owner that is permitted by any other provision of the Contract Documents and that results in a suspension **of part or all of** the Work does not constitute a suspension of Work under this section.

11.2 NOTICE **TO** CURE A DEFAULT If Vendor persistently fails to supply enough qualified workers, proper materials, or equipment **to** maintain the approved Schedule of the Work, or fails to make prompt payment to its workers, Subcontractors, or Suppliers, disregards a Law or orders of any public authority having jurisdiction, or is otherwise guilty of a material breach of a provision of the Contract Documents, Vendor may be deemed in default.

11.2.1 After receiving Owner's written notice, if Vendor fails within seven (7) Days after receipt of written notice from Owner to commence and continue satisfactory correction of such default with diligence and promptness, then Owner shall give Vendor a second notice to correct the default within three (3) Business Days after receipt. The second notice to Vendor, and if applicable, the surety, may include, that Owner intends to terminate this Agreement for default absent appropriate corrective action.

11.2.2 If Vendor fails to promptly commence and continue satisfactory correction of the default following receipt of such second notice, Owner without prejudice to any other rights or remedies may: (a) take possession of the Worksite; (b) complete the Work utilizing reasonable means; (c) withhold payment due to Vendor; and (d) as Owner deems necessary, supply workers and materials, equipment, and other facilities for the satisfactory correction of the default, and charge Vendor the costs and expenses, including reasonable Overhead, profit, and attorneys' fees.

11.2.3 In the event of an emergency affecting the safety of persons or property, Owner may immediately commence and continue satisfactory correction of such default without first giving written notice to Vendor, but shall give Vendor prompt written notice.

11.3 OWNER'S RIGHT TO TERMINATE FOR DEFAULT

**Agreement VNA - WESTON**
Page **21** of **25**

11.3.1 TERMINATION BY OWNER FOR DEFAULT Upon expiration of the second notice period to cure pursuant to §11.2 and absent appropriate corrective action, Owner may terminate this Agreement by written notice. Termination for default is in addition to any other remedies available to Owner under §11.2. If Owner's costs arising out of Vendor's failure to cure, including the costs of completing the Work and reasonable attorneys' fees, exceed the unpaid Contract Price, Vendor shall be liable to Owner for such excess costs. If Owner's costs are less than the unpaid Contract Price, Owner shall pay the difference to Vendor. If Owner exercises its rights under this section, upon the request of Vendor, Owner shall furnish to Vendor a detailed accounting of the costs incurred by Owner.

11.3.2 USE OF VENDOR'S MATERIALS, SUPPLIES, AND EQUIPMENT If Owner or Others perform work under §11.3, Owner shall have the right to take and use any materials and supplies for which Owner has paid and located at the Worksite for the purpose of completing any remaining Work. Owner and others performing work under §11.3 shall also have the right to use construction tools and equipment located on the Worksite and belonging to the Vendor or Subsubcontractors for the purpose of completing the remaining Work, but only after Vendor's written consent. If Owner uses Vendor's construction tools and equipment in accordance with this subsection, then Owner shall indemnify and hold harmless Vendor and applicable Subcontractors and the agents, officers, directors, and employees of each of them, from and against all claims, damages, losses, costs, and expenses, including but not limited to reasonable attorneys' fees, costs, and expenses incurred in connection with Owner's use of Vendor's or applicable subcontractor's construction tools and equipment. Immediately upon completion of the Work, any remaining materials, supplies, or equipment not consumed or incorporated in the Work shall be returned to Vendor in substantially the same condition as when they were taken, reasonable wear and tear excepted.

11.3.3 If Vendor files a petition under the Bankruptcy Code, this Agreement shall terminate if: (a) Vendor or Vendor's trustee rejects the Agreement; (b) a default occurred and Vendor is unable to give adequate assurance of required performance; or (c) Vendor is otherwise unable to comply with the requirements for assuming this Agreement under the applicable provisions of the Bankruptcy Code.

11.3.4 Owner shall make reasonable efforts to mitigate damages arising from Vendor default, and shall promptly invoice Vendor for all amounts due pursuant to §11.21 and §11.32.

## 11.4 TERMINATION BY OWNER FOR CONVENIENCE

11.4.1 Upon Vendor's receipt of Owner's thirty (30) days advanced written notice from Owner, Owner may, without cause, terminate this Agreement. Vendor shall immediately stop the Work, follow Owner's instructions regarding shutdown and termination procedures, and strive to minimize any further costs.

11.4.2 If Owner terminates this Agreement for convenience, Vendor shall be paid for the Work performed to date including Overhead and profit.

11.4.3 If Owner terminates this Agreement, Vendor shall:

11.4.3.1 execute and deliver to Owner all papers and take all action required to assign, transfer, and vest in Owner the rights of Vendor to all materials, supplies, and equipment for which payment has been or will be made in accordance with the Contract Documents and all subcontracts, orders, and commitments which have been made in accordance with the Contract Documents;

11.4.3.2 exert reasonable effort to reduce to a minimum Owner's liability for subcontracts, orders, and commitments that have not been fulfilled at the time of the termination;

11.4.3.3 cancel any subcontracts, orders, and commitments as Owner directs; and

11.4.3.4 sell at prices approved by Owner any materials, supplies, and equipment as Owner directs, with all proceeds paid or credited to Owner.

## 11.5 VENDOR'S RIGHT TO TERMINATE

11.5.1 Seven (7) Days' after Owner's receipt of written notice from Vendor, Vendor may terminate this Agreement if the Work has been stopped for a thirty (30) Day period through no fault of Vendor for any of the following reasons:

(a)    under court order or order of other governmental authorities having jurisdiction;
(b)    as a result of the declaration of a **national** emergency or other governmental act during which, through no act or fault **of Vendor**, materials are not available; or
**(c)**    suspension by **Owner for convenience pursuant to §11.1.**
**(d)**    or fails to make payments **to the Vendor breaching the Agreement**

11.5.2 Upon Owner's receipt of Vendor's thirty (30) days advanced written notice from Vendor, Vendor may, without cause, terminate this Agreement. Vendor shall immediately stop the Work, follow Owner's instructions regarding shutdown and termination procedures, and strive to minimize any further costs.

11.5.3  Upon termination by Vendor in accordance **with this section, Vendor** is entitled to recover from Owner payment for all Work **executed provided the** executed Work could be used by the Owner and the Owner is not restricted **to** make use of the Work due to any kind of missing licenses, etc.

11.6 OBLIGATIONS ARISING **BEFORE TERMINATION Even after termination, the** provisions of this Agreement still apply to any **Work performed, payments made, events occurring, costs charged or incurred,** or obligations arising **before the termination date.**

### ARTICLE 12 DISPUTE MITIGATION AND RESOLUTION

12.1 WORK CONTINUANCE **AND PAYMENT** Vendor shall continue the Work and maintain the Schedule of the Work **during any dispute mitigation or resolution procedure.** If Vendor continues to perform, Owner shall continue **to make undisputed payments in accordance with this Agreement.**

12.2 DIRECT DISCUSSIONS **If the** Parties cannot reach resolution on a matter relating to or arising out of this Agreement, the **Parties** shall endeavor to reach resolution through good faith direct discussions between the Parties' representatives, who shall possess the necessary authority to resolve such matter and who shall record the date of first discussions. If the Parties' representatives are not able to resolve such matter within five (5) Business Days from the date of first discussion, the Parties' representatives shall immediately inform senior executives of the Parties in writing that a resolution could not be reached. Upon receipt of such notice, the senior executives of the Parties shall meet within five (5) Business Days to endeavor to reach resolution. If the dispute remains unresolved after fifteen (15) Days from the date of first discussion, the Parties shall submit such matter to the dispute mitigation and dispute resolution procedures selected below.

12.3 BINDING DISPUTE RESOLUTION If the matter is unresolved after discussions, the Parties shall submit the matter to the binding dispute resolution procedure selected below:

#### 12.3.1 ARBITRATION

The Parties choose binding arbitration for any claim or dispute arising out of or relating to this Agreement. **EACH PARTY WAIVES THEIR RIGHT TO BE HEARD IN A COURT OF LAW,** with or without a jury. Arbitration does not involve a judge or jury. Instead, an arbitrator with the power to award damages and other appropriate relief will decide claims and disputes. An arbitrator's award shall be final and binding upon the Parties, and judgment may be entered upon it in any court having jurisdiction.

12.3.1.1 Neither Party may commence arbitration if the claim or cause of action would be barred by the applicable statute of limitations had the claim or cause of action been filed in a state or federal court. Receipt of a demand for arbitration by the person or entity administering the arbitration shall constitute the commencement of legal proceedings for the purposes of determining whether a claim or cause of action is barred by the applicable statute of limitations. If, however, a state or federal court exercising jurisdiction over a timely filed claim or cause of action orders that the claim **or** cause of action be submitted to arbitration, the arbitration proceeding shall be deemed commenced **as** of the date the court action was filed, provided that the Party asserting the claim or cause of action files its demand for arbitration with the person or entity administering the arbitration within thirty (30) Days after the entry of such order.

12.3.1.2 The arbitration shall use the following rules:

**Agreement VNA - WESTON**
Page **23** of **25**

The current AAA Construction Industry Arbitration Rules and AAA administration. AAA Construction Fast Track Rules shall apply to all two-party cases when neither Party's disclosed claim or counterclaim exceeds $250,000. If arbitration is selected but no rules are selected, then this subsection shall apply by default;

### 12.3.2 LITIGATION

Litigation in either the state or federal court having jurisdiction of the matter in the location of the Project.

If not indicated, then litigation is the default and not arbitration.

12.3.3 COSTS The costs of any binding dispute resolution procedures and reasonable attorneys' fees shall be borne by the non-prevailing Party, as determined by the adjudicator of the dispute.

12.3.4 VENUE The Project location shall serve as the venue.

12.4 MULTIPARTY PROCEEDING All parties necessary to resolve a matter agree to be parties to the same dispute resolution proceeding, if possible. Appropriate provisions shall be included in all other contracts relating to the Work to provide for the joinder or consolidation of such dispute resolution procedures.

12.5 LIEN RIGHTS Nothing in this article shall limit any rights or remedies not expressly waived by Vendor that Vendor may have under lien laws.

### ARTICLE 13 MISCELLANEOUS

13.1 EXTENT OF THE CONTRACT DOCUMENTS Except as expressly provided, this Agreement is for the exclusive benefit of the Parties, and not for the benefit of any third party. The Contract Documents represent the entire and integrated agreement between the Parties, and supersedes all prior negotiations, representations, or agreements, either written or oral.

13.2 ASSIGNMENT Except as to the assignment of proceeds, the Parties shall not assign their interest in this Agreement without the written consent of the other which shall not be unreasonably withheld. The terms and conditions of the Contract Documents shall be binding upon both Parties, their partners, successors, assigns, and legal representatives. Neither Party shall assign the Agreement as a whole without written consent of the other except that Owner may assign the Agreement to a wholly owned subsidiary of Owner when Owner has fully indemnified Vendor or to an institutional lender providing construction financing for the Project as long as the assignment is no less favorable to Vendor than this Agreement. If such assignment occurs, Vendor shall execute any consent reasonably required. In such event, the wholly owned subsidiary or lender shall assume Owner's rights and obligations under the Contract Documents. If either Party attempts to make such an assignment, that Party shall nevertheless remain legally responsible for all obligations under the Contract Documents, unless otherwise agreed by the other Party.

13.3 GOVERNING LAW The law in effect at the location of the Project shall govern this Agreement.

13.4 SEVERABILITY The partial or complete invalidity of any one or more provisions of this Agreement shall not affect the validity or continuing force and effect of any other provision.

13.5 NOTICE Unless changed in writing, a Party's address indicated in Article 1 shall be used when delivering notice to a physical address. Except for Agreement termination and as otherwise specified in the Contract Documents, notice is effective upon transmission by any effective means, including U.S. postal service and overnight delivery service.

13.6 NO WAIVER OF PERFORMANCE Either Party's failure to insist upon any, in any one or more instances, on the performance of any of the terms, covenants, or conditions of this Agreement, or to exercise any of its rights, shall not be construed as a waiver or relinquishment of such term, covenant, condition, or right with respect to further performance or any other term, covenant, condition, or right.

13.7 TITLES The titles given to the articles are for ease of reference only and shall not be relied upon or cited for any other purpose.

13.8 JOINT DRAFTING The Parties expressly agree that this Agreement was jointly drafted, and that both had opportunity to negotiate its terms and to obtain the assistance of counsel in reviewing its terms before

execution. Therefore, this Agreement shall be construed neither against nor in favor of either Party, but shall be construed in a neutral manner.

## ARTICLE 14 CONTRACT DOCUMENTS

**14.1 EXISTING CONTRACT DOCUMENTS**

(a)

**14.2 INTERPRETATION OF CONTRACT DOCUMENTS**

14.2.1 The drawings and specifications are complementary. If Work is shown only on one but not on the other, Vendor shall perform the Work as though fully described on both.

14.2.2 In case of conflicts between the drawings and specifications, the specifications shall govern. In any case of omissions or errors in figures, drawings, or specifications, Vendor shall immediately submit the matter to Owner for clarification. Subject to an equitable adjustment in Contract Time or Contract Price pursuant to ARTICLE 8, or a dispute mitigation and resolution, Owner's clarifications are final and binding.

14.2.3 Where figures are given, they shall be preferred to scaled dimensions.

14.2.4 Unless otherwise specifically defined in this Agreement, any terms that have well-known technical or trade meanings shall be interpreted in accordance with their well-known meanings.

14.3 ORDER OF PRECEDENCE In case of any inconsistency, conflict, or ambiguity among the Contract Documents, the documents shall govern in the following order: (a) Change Orders and written amendments to this Agreement; (b) this Agreement; (c) subject to §14.2.2 the drawings (large scale governing over small scale), specifications, and addenda issued and acknowledged before Agreement execution or signed by both Parties; (d) other Contract Documents listed in this Agreement. Among categories of documents having the same order of precedence, the term or provision that includes the latest date shall control.

OWNER: Verbio North America Corporation, a Michigan corporation

BY: _____ NAME: Dr. Oliver Lüdtke TITLE: COO

WITNESS: _____ NAME: Rand Dueweke TITLE: CFO

_____ 22/01/2019

VENDOR: Weston and Associates, LLC, an Ohio limited liability company

BY: _____ NAME: Andrew W. Fackler TITLE: President

WITNESS: _____ NAME: _____ TITLE: _____

# Exhibit A



BASED ON ALTA/NSPS LAND TITLE SURVEY
BOCK&CLARK OCTOBER 10, 2018

1" = 75'
GRAPHIC SCALE

# Exhibit B





300 mm Gaspipe

5/8" Ø HOLE (4) 50 mm additional

100 mm S - glass

125 mm DIA.

1'-7"

1'-9"

1'-3"

3"

8"

1'-3"

1"

1'-3"

6"

1'-8"

1'-1"

200 mm additional

HANDLE (4 REQ'D)

100 mm DIA.

safty valve

7"

6"

1'-2"

1'-5"

125 mm DIA.

100 mm LSH

AWF
SPD

# Exhibit C

|  | Technical specification Tank constructions | Verbio Nevada EQP_SPEC_001 Page **1** of **13** |
|---|---|---|

## Delivery item:

## Steel tanks 10.000m³ for biogas plant



-Example not representative-

| Rev. | Created/ date | Checked/ date | Release/ date | Changes |
|---|---|---|---|---|
| **Lott / 15.01.19** | | **FKG/17.01.19** | | |
| Created / Date | | Checked/Date | | Release/Date |



| | Technical specification<br>Tank constructions | Verbio Nevada<br>EQP_SPEC_001<br>Page **2** of **13** |
|---|---|---|

**Index**

1    Introduction ..................................................................................................3

2    Technical specifications ...............................................................................3

3    Scope of delivery and services ....................................................................7

   3.1    Position list (preliminary) .......................................................................7

   3.2    Delivery limits ........................................................................................8

   3.3    Delivery..................................................................................................8

   3.4    Scope of Services: .................................................................................8

   3.5    Exclusions .............................................................................................9

4    Designing......................................................................................................9

   4.1    General information................................................................................9

   4.2    Construction ..........................................................................................9

   4.3    Test ......................................................................................................10

5    Inspections .................................................................................................11

6    Installation..................................................................................................11

7    Technical warranty .....................................................................................11

8    Documentation scope.................................................................................12

APPENDIX A: Design Criteria ...........................................................................13

AWF

|  | Technical specification<br>Tank constructions | Verbio Nevada<br>EQP_SPEC_001<br>Page **3** of **13** |
|---|---|---|

# 1   Introduction

VERBIO North America Corporation (VNA) is planning to build a biogas plant in Nevada, Iowa. This plant will produce biomethane for feeding into the public natural gas grid.

# 2   Technical specifications

The Tank design have to follow the following design and operating conditions:

| | | |
|---|---|---|
| **Operating pressure:** | 0 - 0.73 psi (g) | *(0 - 50 mbar (g))* |
| **Design pressure:** | -0.07 psi (g) – 0.77 psi (g) | *(-5 - 53 mbar (g))* |

(Differential pressure with respect to respective barometric pressure)

| | | |
|---|---|---|
| **Operating Temperature** | 122°F | *(50°C)* |
| **Max. Temperature** | 131°F | *(55°C)* |

Chemical resistance against the components in the condensate, liquid phase and gas.
The chemical composition of the phases is described in the following tables in detail:

| Parameter Liquid phase; PH value 6,5 – 8,5 | | | | |
|---|---|---|---|---|
| | | Max. | Min. | Typ. value |
| Water | Ma.-% (percent by mass) | 100 | 85 | 92 |
| Dry matter (DM) | Ma.-% | 15 | 0 | 8 |
| Org. Acids | Ma.-% | 2 | 0 | 0,2 |
| acetic acid | Ma.-% | 1 | 0 | 0,05 |
| Sulfides | Ma.-% | 0,1 | 0,005 | 0,015 |
| S total | Ma.-% | 0,15 | 0,01 | 0,05 |
| Sulfates | Ma.-% | 0,3 | 0,001 | > 0,01 |
| chloride | Ma.-% | 0,1 | 0,01 | 0,04 |
| ammonium (Of which 10% Ammonia) | Ma.-% | 1,5 | 0,05 | 0,5 |
| Salts (e.g. K, P, Na) | Ma.-% | 2 | 0,5 | 1 |



| verbio Biofuel and Technology | Technical specification Tank constructions | Verbio Nevada EQP_SPEC_001 Page **4** of **13** |
|---|---|---|

| Parameter condensate composition in the gas phase | |
|---|---|
| Chemical resistance against the following parameter | Acetic acid, CO2, H2S, ammonia |
| pH- value | 4,5...7,0 |
| Chlorides in straw processing | No emission via gas phase -> not in the condensate |
| Mineral acids | No emission via gas phase -> not in the condensate |
| Organic acids | Max. 0.01% acetic acid Max. 1% acetic acid |
| ammonia | Min.: 0,1 g NH3/ kg H2O Max.: 0,2 g NH3/ kg H2O |

| Parameter gas composition (Dry gas is saturated with water vapor at the temperature in the liquid) | | | | |
|---|---|---|---|---|
| | | Max | Min | Typical values |
| **H2** | Vol.- % | 0,04 | **0** | **0,01** |
| **O2** | Vol.- % | **0,1** | **0** | **0** |
| **N2** | Vol.- % | **0,143** | **0,03** | **0,04** |
| **CO2** | Vol.- % | 50,1 | 40,7 | 44 |
| CH4 | Vol.- % | 59,2 | 49,8 | **54** |
| **Higher KW** | Vol.- % | 0,010 | 0,000 | 0,001 |
| **Benzene / toluene / xylenes / ethylbenzene** | Vol.- % | | | **traces** |
| NH3 | Vol.- % | **1** | **0** | **0,1** |
| H2S | Vol.- % | **2** | **0,5** | **1,3** |

**Other requirements**

- Liquid-tight / gas-tight (diffusion-tight) and chemically resistant to ingredients
- Crack width limit wall, floor 0.15 mm
- Mechanically resistant



| | Technical specification Tank constructions | Verbio Nevada EQP_SPEC_001 Page **5** of **13** |
|---|---|---|

**Installation and ambient conditions:**

The tanks / fermenters going to be installed outdoors

| Ambient Temperature | -4 °F – 95°F | (-20 °C – 35°C) |
|---|---|---|
| Ground level | 970 ft (above sea level) | (295 m) |
| Wind loads | | |
| Earth quake zone | See Appendix A | |
| Snow | | |

All relevant/applicable American standards must be complied.

The fermenters, with a nominal content of 10,000m³, consist of steel (Light inside dimensions / inner diameter 26.0 m, wall thickness according to static requirement plus insulation preparation, cylindrical height 20 m).
The following loads must be taken into account for the pipe nozzles in the roof area and the wall:

| DN NPS | N | | | Nm | | |
|---|---|---|---|---|---|---|
| | P | $V_L$ $V_1$ | $V_C$ $V_2$ | $M_L$ $M_1$ | $M_C$ $M_2$ | $M_t$ |
| 50 | 2300 | 3100 | 2300 | 500 | 400 | 800 |
| 80 | 3500 | 4100 | 3000 | 1400 | 900 | 1800 |
| 100 | 4300 | 4800 | 3500 | 2100 | 1400 | 2600 |
| 150 | 6700 | 6800 | 4800 | 4000 | 2600 | 4800 |
| 200 | 9500 | 9300 | 6300 | 6400 | 4200 | 7300 |
| 250 | 12600 | 12200 | 8000 | 9100 | 6100 | 10200 |
| 300 | 16200 | 15500 | 9800 | 12200 | 8300 | 13400 |
| 350 | 20100 | 19300 | 11900 | 15700 | 10900 | 16900 |
| 400 | 24300 | 23400 | 14000 | 19800 | 13600 | 20900 |
| 450 | 29000 | 28000 | 16400 | 23900 | 17000 | 25200 |
| 500 | 34000 | 33000 | 18900 | 28500 | 20600 | 29600 |
| 600 | 45200 | 44300 | 24500 | 39000 | 28600 | 40100 |
| 700 | 57900 | 57200 | 30700 | 51000 | 38000 | 51500 |
| 800 | 72100 | 71800 | 37800 | 64600 | 48700 | 65000 |
| 900 | 87700 | 88100 | 45200 | 79700 | 60600 | 79600 |
| 1000 | 104900 | 106100 | 53500 | 96300 | 73900 | 95500 |

Furthermore, 2 agitators are arranged in the wall area as follows and carry additional dynamic loads, which must also be taken into account in the design. The agitator nozzle R1 is located at 1.50 m and the agitator stub R3 at 6.25 m above bottom plate. The design of the two nozzles is as follows:

AWF
GPC



| | Technical specification<br>Tank constructions | Verbio Nevada<br>EQP_SPEC_001<br>Page **6** of **13** |
|---|---|---|

R1 (-20 ° horizontal)                                  R3 (-20 ° horizontal, + 20 ° vertical)



The stirrer itself is carried out as follows and arranged in plan:





| | Technical specification<br>Tank constructions | Verbio Nevada<br>EQP_SPEC_001<br>Page **7** of **13** |
| --- | --- | --- |

## 3  Scope of delivery and services

### 3.1  Position list (preliminary)

| Position no. | amount | Description |
| --- | --- | --- |
| 01 | general | Site equipment |
| 02 | 1 | Fermenter incl. roof construction and floor plate |
| 03 | 1 | Delivery and assembly of manholes ($^1$) 32'' with swivel arm, in wall area, position according to specification of purchaser |
| 04 | 1 | Delivery + mounting of pipe nozzle ($^1$) for agitators With flange (Thread), 16'' Class 150, in wall area, position according to specification of purchaser |
| 05 | 1 | Gas-tight ceiling construction, chemically resistant like PP ($^2$) (polypropylene) |
| 06 | general | Supply and assemble the outer scaffold and provide it for the construction period (optional by purchaser) |
| 07 | 1 week | Extension week for inner - or outer scaffold for use by other technical crews |
| 08 | 1 | Welding plates for steel stairs delivering and installing (11'x11' (400mmx400mm) with forces in X, Y, Z of 10 kN each, number according to factory planning and respective container overview) |
| 09 | 1 | Welding plates for pipe support (8' x8' (200mm x 200mm) with forces in X, Y, Z of 30 kN each), in the wall and ceiling area, according to specification of purchaser, number according to factory planning and respective container overview |
| 10 | 1 | Leak testing (water is provided by the customer for the first fermenter and then disposed of), water filling height 60ft (18m), test pressure 0.9psi (60mbar), test time 5h, including temperature compensation |
| 11 | 1 | Delivering + fitting pipe connection ($^1$) with flange ,2'' Class 150, in the wall and ceiling area, location according to the specifications of purchaser, number according to plant planning and respective container overview |
| 12 | 1 | Delivery and assembly of pipe connection ($^1$) with flange, 4'' Class 150, in the wall and ceiling area, position according to purchaser, number according to factory planning and respective container overview |
| 13 | 1 | Delivery and installation of pipe connection ($^1$) with flange, 8'' Class 150, in the wall and ceiling area, position according to purchaser, number according to plant planning and respective container overview |
| 14 | 1 | Delivery + Installation of pipe connection (1) with flange, 16'' Class 150, in the wall and ceiling area, according to the specification of purchaser, number according to plant planning and respective container overview |

$^{1)}$  The tenderer must specify respectively approve the design. By doing so the tender warrants that the fermenters are sealed in the area of the built-in parts.

$^{2)}$  Equivalent to a PP (polypropylene) lining, in addition, corresponding design details must be specified or checked / tested in the area of the stub diameters as well as in the corner area.



|  | Technical specification<br>Tank constructions | Verbio Nevada<br>EQP_SPEC_001<br>Page **8** of **13** |
|---|---|---|

## 3.2 Delivery limits

The supplier is responsible for the interpretation of the defined scope of delivery including the coordination of the interfaces.
The execution and spatial arrangement of the interfaces is to coordinate with the purchaser within the frame of the planning the work until the date of commissioning or in the case of assignment.

## 3.3 Delivery

All components within the described delivery limits are included in the delivery:

- steel fermenter
- rack width Wall & Floor 0.15mm
- gas-tight ceiling design, chemically and mechanically resistant like PP (polypropylene)
- steel components for service and running platforms with stairs, see corresponding work plans.
- steel components for pipe brackets vertically in the wall area, according to pipeline routing see corresponding work plans
- all openings and installation parts for agitators, manhole, nozzles, feedthroughs according to the overview plan for installation parts, see corresponding work plans
- grounding and potential equalization to avoid electrostatic charges
- documentation as specified in Chapter 10
- Transport support and auxiliary equipment, where necessary
- Construction site equipment, cranes, scaffolding, hoists and transport vehicles

## 3.4 Scope of Services:

- Mechanical design (calculation, construction, factory planning) of the roof construction, a release of the purchaser for the plant planning is necessary
- Creating the auditable rupture strength - / stress analysis
- Technical clarification with the building supervisory authority, obtaining of the consent in individual cases, in case no building inspectorate material approval exists
- Production / manufacturing
- Preparation of QA documents and testing plans (production and testing plan, etc.)
- Quality tests and in establishing at the site in particular pressure / leak test in accordance with preset of purchaser, logging
- Documentation as specified in chapter 10, including the preparation of manufacturer's declarations, risk / risk assessment, provision of necessary certificates, proof of installation, test certificates
- Participation in meetings at the purchaser within the framework of order processing (e.g. kick - off, assembly preparation, etc.)
- For transport and assembly

Preparation of transport / lifting studies, if necessary, Intermediate storage and transport on the construction site if the scaffolding is required, Work platforms etc. inside and outside Installation / erection / installation / installation on site including necessary tools, auxiliary and test equipment, hoists, personnel, construction site supervision and construction management



| | Technical specification<br>Tank constructions | Verbio Nevada<br>EQP_SPEC_001<br>Page **9** of **13** |
|---|---|---|

### 3.5  Exclusions

- Steel construction work
- Insulation
- Manufacture / delivery of equipment outside the delivery limit
- Subsequent pipelines (planning, material and installation)
- Screws, nuts and seals for subsequent piping and assembly, The last flange connection or welding of the last seam
- Pre - assembly and storage area incl. Access as well as building current, water for. Building site (Standing position)

## 4  Designing

### 4.1  General information

The equipment shall be designed, manufactured, tested and supplied in accordance with the accompanying documents (data sheets, guidelines, standards, etc.) and this requisition as well as the listed regulations.

Valid ASME and the generally accepted rules of technology must be complied. Standard materials and parts shall be used whenever possible. When choosing materials, consideration must be given to mechanical / thermal as well as chemical / corrosive stresses, including UV exposure and planned service life. If DIN not available all relevant/applicable Indian standards must be complied.
The Supplier must produce verifiable strength proofs / proof of stability and must be submitted in duplicate (2 times) in the original with signature for the test. The verification must be carried out according to the recognized rules of technology. The service life should be at least 20 years. Unless otherwise defined:

- The calculation temperature and pressure correspond to at least the minimum / maximum permissible temperature (TS) and the minimum / maximum permissible pressure (PS) at site of installation
- The manufacturer is responsible for adequate dimensioning and the proper/ professional planning and execution of the construction. The changes resulting from the official test must be entered in a cost neutral manner.

All relevant/applicable American standards must be complied.

### 4.2  Construction

The entire design must comply with the current standards and guidelines and be carried out in accordance with the valid regulations. A computational crack width limitation of 0.15 mm in the floor area and 0.15 mm in the wall area is to be taken into account.
The required exposure classes shall be selected according to the specification of the fermentation used substrate.
The entire design is to construct gas tight as well as chemically and mechanically resistant. A proof of resistance against the specification of raw biogas/ condensate / liquid phase.

|  | Technical specification<br>Tank constructions | Verbio Nevada<br>EQP_SPEC_001<br>Page **10** of **13** |
|---|---|---|

The following details are to be observed during construction:

- Manifolds In the tank mantle, manhole / stirrer, measuring instruments etc. according to the nozzle table
- Steel components for pipe guideways in the wall and roof area (inside and outside)
- Operation and platforms for the accessibility of the manifolds in the roof area mentioned above in a 3m strip along the tank diameter with a uniform surface load of 5 kN / m².
- Connection bridges between the individual tanks (permissible ceiling loads min. 2.5 kN / m²)
- Maintenance platforms in the area of tank agitators (permissible ceiling loads min. 2.5 kN / m²)
- Permissible stub loads for stirrers on 16″ nozzles in concrete wall

| Mixer Weight | |
|---|---|
| Total weight | Appr. 800 kg (1760 lbs) |

| Dynamics Loads | |
|---|---|
| Torque | 1355 Nm |
| Belding Moment 25% | 2165 Nm |
| Axial thrust without agitator weight | 3900 N |

All nozzle flanges are matched to the pipe classes of the purchaser (specification of the nominal width / pressure rating / sealing surface in the nozzle table, see appendix). For reasons of stability, nozzles are only designated with nominal diameters > 2″. The arrangement of the threaded bolt holes on the flanges is axis-free, but the flange design is preferably.

Support construction (steel components) as described above must be designed in such a way that the pipe forces can be absorbed. The permissible spigot loads must be indicated in a table on the main drawing, the corresponding spigots, and the direction of action of the forces and moments in the x-, y-, and z- directions must be clearly shown.

The process lines as well as the operating equipment are piped to the transfer points or the apparatus support (planning, delivery and assembly by purchaser with the contractor for pipeline construction). The position of the transfer points must be defined exactly in the order processing (see also list of transfer points).

When designing the floor slab, be aware that the joint between the floor and the wall must be visible.

## 4.3   Test

The fermenter including the roof construction is subjected to a pressure test / leak test water filling height 20 m, test pressure 53 mbar over 5h minimum duration.
The results of all tests shall be recorded.



| | Technical specification<br>Tank constructions | Verbio Nevada<br>EQP_SPEC_001<br>Page **11** of **13** |
|---|---|---|

## 5  Inspections

The manufacturing and testing is carried out according to the design instructions, specifications and valid standards, as well as the requirements of the manufacturer.

The supplier shall draw up a production sequence and test sequence plan (in accordance with applicable regulations).

The contracting entity, the notified body or an organization designated by the contracting authority shall at all times have the right to check the quality of the materials on the basis of the required test certificates, the flawless production as well as the compliance with the regulations, standards and data in the supplier's works and, if necessary, also with the subcontractors.

## 6  Installation

The date for assembly on the site / work of the purchaser will be determined at a later date.

The assembly costs must be calculated in advance by the supplier and stated as a fixed price in the quotation.

## 7  Technical warranty

Supplier's warranty obligation applies to:

- The mechanical design, tightness and durability of the materials used in accordance with the specified process parameters (also for the design of the components not supplied, with regard to the tightness between the concrete and the component).
- Tolerances in concrete construction (see pages 4 & 5)
- Use of fault-free materials and proper processing.



|  | Technical specification<br>Tank constructions | Verbio Nevada<br>EQP_SPEC_001<br>Page **12** of **13** |
|---|---|---|

## 8   Documentation scope

The documentation documents are in duplicate in paper form (2 times) and 1- fold as digital media, in PDF -, DOC, XLS, MPP and DWG format.

**Delivery 4 weeks after commissioning:**

1. Project-organigram
2. Schedules including production schedules and inspection data
3. Assembled- documentation
4. Documentation for acceptance tests and inspections
5. List of applied test regulations and standards
6. Overview and detail drawings with parts lists and individual parts
7. List of cast parts, overview maps of fixtures
8. Strength calculations, verifiable
9. Stability test, verifiable
10. List of special tools and equipment, if necessary
11. Bolting procedures
12. Procedure for gasket installation

**Delivery with final documentation**

1. Declaration of Conformity
2. Professional company statement
3. Lightning protection test report
4. Building approvals, product documentation
5. Complete documentation of own and third-party monitoring, such as registration#
6. As-built Drawings (Overview and detail incl. Parts list, nozzle table and individual parts)
7. Construction manuals
8. Welding and inspection plans, complete documentation
9. Complete documentation of the leak test and pressure test



| **verbio** Biofuel and Technology | Technical specification Tank constructions | Verbio Nevada EQP_SPEC_001 Page **13** of **13** |
|---|---|---|

## APPENDIX A: Design Criteria

### CODES AND DESIGN CRITERIA:

1. PERFORM ALL CONSTRUCTION IN CONFORMANCE WITH THE BUILDING AND DESIGN CODES REFERENCED WITHIN THIS DOCUMENTS. THE PROJECT DOCUMENTS REFER TO THE FOLLOWING CODES AND STANDARDS, UOH:

1.1 INTERNATIONAL BUILDING CODE (IBC) 2015
1.2 ASCE 7-10, MINIMUM DESIGN LOADS FOR BUILDINGS AND OTHER STRUCTURES.
1.3 ACI 318-14, BUILDING CODE REQUIREMENTS FOR STRUCTURAL CONCRETE.
1.4 AISC 325-10, STEEL CONSTRUCTION MANUAL, 14TH EDITION.

2. OCCUPANCY CLASSIFICATION PER ASCE 7-10: RISK CATEGORY II

3. DESIGN LOADS AND REQUIREMENTS:

3.1 DEAD LOADS
BUILDING WEIGHT/SELF-WEIGHT
ROOFING ......................................... 7 PSF
PLATFORM GRATING ....................... 10 PSF

3.2 LIVE LOADS
STAIRS ............................................ 70 PSF
CATWALKS ...................................... 40 PSF
WALKWAYS & ELEVATED PLATFORMS .... 70 PSF
ROOFS ............................................ 20 PSF (UNREDUCED)
OFFICES .......................................... 50 PSF
LOBBIES & FIRST FLOOR CORRIDORS .... 100 PSF
POINT ALONG PRIMARY MEMBERS ...... 2.0 KIP
OF WAREHOUSES
ALL OTHER PRIMARY ROOF MEMBERS .... 300 LB
SLAB ON GRADE ............................... PER BLDG
G1 ......................... XXX PSF
G2 ......................... 310 PSF
G3 ......................... XXX PSF
G6 ......................... XXX PSF
G7 ......................... XXX PSF

3.3 SNOW LOADS
GROUND SNOW LOAD ....................... 25 PSF
FLAT ROOF SNOW LOAD ................... 20.5 PSF
EXPOSURE FACTOR, Ce ...................... 0.90
THERMAL FACTOR, Ct ....................... 1.0
IMPORTANCE FACTOR, Is .................. 1.0
MIN. SNOW LOAD (LOW SLOPE ROOFS) .... 20 PSF
ROOF SLOPE FACTOR, Cs ................... PER BLDG
G1 ......................... X.X
G2 ......................... 1.0
G3 ......................... X.X
G6 ......................... X.X
G7 ......................... X.X
BALANCED SLOPED ROOF SNOW LOAD .... PER BLDG
S1 ......................... XX PSF
S2 ......................... 20.5 PSF
S3 ......................... XX PSF
S6 ......................... XX PSF
S7 ......................... XX PSF
SNOW DRIFTING PER CODE

3.4 WIND LOAD DESIGN CRITERIA
MWFRS
BASIC DESIGN WIND SPEED, V .............. 115 MPH
WIND IMPORTANCE FACTOR, Iw ........... 1.0
EXPOSURE CATEGORY ........................ C
BUILDING CATEGORY .......................... ENCLOSED
INTERNAL PRESSURE COEFFICIENT ....... ±0.18

COMPONENT & CLADDING DESIGN PRESSURES
EFFECTIVE AREA, WALLS
G1 ......................... XXX SF
G2 ......................... 108 SF
G3 ......................... XXX SF
G6 ......................... XXX SF
G7 ......................... XXX SF
EXT. PRESSURE COEFFICIENT, WALLS
G1 ......................... ZONE 4: +X.XX / -X.XX ZONE 5: +X.XX / -X.XX
G2 ......................... ZONE 4: +0.82 / -0.91 ZONE 5: +0.82 / -1.03
G3 ......................... ZONE 4: +X.XX / -X.XX ZONE 5: +X.XX / -X.XX
G6 ......................... ZONE 4: +X.XX / -X.XX ZONE 5: +X.XX / -X.XX
G7 ......................... ZONE 4: +X.XX / -X.XX ZONE 5: +X.XX / -X.XX
EFFECTIVE AREA, ROOFS
G1 ......................... XXX SF
G2 ......................... 108 SF
G3 ......................... XXX SF
G6 ......................... XXX SF
G7 ......................... XXX SF
EXT. PRESSURE COEFFICIENT, ROOFS
G1 ......................... ZONE 4: +X.XX / -X.XX ZONE 5: +X.XX / -X.XX
G2 ......................... ZONE 1: +0.30 / -0.80, ZONE 2: +0.30 / -1.50, ZONE 3: +0.30 / -2.00
G3 ......................... ZONE 4: +X.XX / -X.XX ZONE 5: +X.XX / -X.XX
G6 ......................... ZONE 4: +X.XX / -X.XX ZONE 5: +X.XX / -X.XX
G7 ......................... ZONE 4: +X.XX / -X.XX ZONE 5: +X.XX / -X.XX

3.5 SEISMIC LOAD DESIGN CRITERIA
SEISMIC IMPORTANCE FACTOR (Ie) ....... 1.0
Ss .................................................. 0.061
S1 .................................................. 0.044
SDS ................................................ 0.066
SD1 ................................................ 0.070
SITE CLASS ...................................... D
SEISMIC DESIGN CATEGORY ................ D
LATERAL SYSTEM DESCRIPTION ........... STEEL ORDINARY MOMENT FRAMES
RESPONSE MODIFICATION COEFF., R ..... 3.5
SEISMIC RESPONSE COEFFICIENT, Cs .... 0.019
ANALYSIS PROCEDURE ........................ EQUIVALENT LATERAL FORCE

4. SERVICEABILITY
LIVE LOAD ....................................... L/360
LONG TERM DEFLECTION .................. L/120



# Exhibit D

# Exhibit D_Documentation

## First Documentation

1. Project-organigram
2. Schedules including production schedules and inspection data
3. Assembled- documentation
4. Documentation for acceptance tests and inspections
5.  List of applied test regulations and standards
6. Overview and detail drawings with parts lists, nozzle table and individual parts
7. List of cast parts, overview maps of fixtures
8. Strength calculations, verifiable
9. Stability test, verifiable
10. List of special tools and equipment, if necessary
11. Bolting Procedure
12. Procedure for gasket installation

## Documentation

1. Declaration of Conformity
2.  Professional company statement
3. Lightning protection test report
4.  Building approvals, product documentation
5. Complete documentation of own and third-party monitoring, such as registration
6. As-built Drawings (Overview and detail incl. Parts list, nozzle table and individual parts)
7. Construction manuals
8. Welding and inspection plans, complete documentation
9. Complete documentation of the leak test and pressure test

# Exhibit E

## Exhibit E: payment conditions - 8 fermenter tanks

| Total price | $ | 13,4 Mio. Dollar |
|---|---|---|
| | | 13.400.000,00 Dollar |

| Payment number | payment definition | percentage share | invoice amount [Dollar] | invoice date/penalty date | payment requirment |
|---|---|---|---|---|---|
| 1. Payment | conformation of the order | 10,00% | 1.340.000,00 | | will be used as an Retainer and will be payed after final completion (Beschphasen under payment 44 - payment requirment) |
| 2. Payment | First Documentation | 16,00% | 2.144.000,00 | | signed overview and detailed drawings |
| 3. Payment | insulation external costs + material cost for the panels | 12,00% | 1.608.000,00 | | submittal + control of the construction managen Verbu |
| 4. Payment | 1306001.1 foundations | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 5. Payment | 1306001.1 walls | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 6. Payment | 1306001.1 roof | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 7. Payment | 1306001.1 insulation | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 8. Payment | 1306001.1 water thightness test + gas thightness test | 3,125% | 418.750,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 9. Payment | 1306002.1 foundations | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 10. Payment | 1306002.1 walls | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 11. Payment | 1306003.1 roof | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 12. Payment | 1306002.1 insulations | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 13. Payment | 1306002.1 water thightness test + gas thightness test | 3,125% | 418.750,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 14. Payment | 1306003.1 foundations | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 15. Payment | 1306003.1 walls | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 16. Payment | 1306003.1 roof | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 17. Payment | 1306003.1 insulation | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 18. Payment | 1306003.1 water thightness test + gas thightness test | 3,125% | 418.750,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 19. Payment | 1306004.1 foundations | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 20. Payment | 1306004.1 walls | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 21. Payment | 1306004.1 roof | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 22. Payment | 1306004.1 insulation | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 23. Payment | 1306004.1 water thightness test + gas thightness test | 3,125% | 418.750,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 24. Payment | 1306001.2 foundations | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 25. Payment | 1306001.2 walls | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 26. Payment | 1306001.2 roof | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 27. Payment | 1306001.2 insulation | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 28. Payment | 1306001.2 water thightness test + gas thightness test | 3,125% | 418.750,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 29. Payment | 1306002.2 foundations | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 30. Payment | 1306002.2 walls | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 31. Payment | 1306002.2 roof | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 32. Payment | 1306002.2 insulation | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 33. Payment | 1306002.2 water thightness test + gas thightness test | 3,125% | 418.750,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 34. Payment | 1306003.2 foundations | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 35. Payment | 1306003.2 walls | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 36. Payment | 1306003.2 roof | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 37. Payment | 1306003.2 insulation | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 38. Payment | 1306003.2 water thightness test + gas thightness test | 3,125% | 418.750,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 39. Payment | 1306004.2 foundations | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 40. Payment | 1306004.2 walls | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 41. Payment | 1306004.2 roof | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 42. Payment | 1306004.2 insulation | 1,00% | 134.000,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| 43. Payment | 1306004.2 water thightness test + gas thightness test | 3,125% | 418.750,00 | | completion message with acceptance protocol signed by contractor/Verbu |
| | | | final completion | | |
| 44. Payment | 1. handing over and checking the documentation<br>2. warranty/maintenance bond | 5,00% | 670.000,00 | | 1. acceptance protocol signed by Verbu<br>2. additionally we repay 5% of the Retainer of the first Payment<br>3. additionally the residual 5% of the Retainer will be paid equavalent to a maintenance bond until the warranty period of 5 years is over |
| | **Total** | **100,00%** | **13.400.000,00** | | |

# Exhibit F



**Weston and Associates, LLC.**
**115 David Canary Dr. Suite A**
**Massillon, Ohio 44647**

**RE: Quote # 52649-1**
**i.V. Falko König**
Leiter Projektgruppe/ Head of Projectmanagement
**VERBIO Vereinigte BioEnergie AG**
Thura Mark 18
06780 Zörbig
Telefon: +49(0) 34956 303 - 720
Mobil:   +49(0) 176 13085313
Email:   falko.koenig@verbio.de
ternet: www.verbio.de

## Introduction

Weston & Associates "Weston" appreciates the opportunity to provide you with the following proposal for your upcoming project. At Weston, we approach every request for information and quote as an opportunity to earn your business and want to be sure we understand your needs and the challenges you face with your project.

## Tank Design:

PERMASTORE® structures have a predicted minimum **30 year** design life based on a comprehensive assessment of the service life of the components used in the structure, in compliance with the requirements of ISO 15686-1:2011, ISO 15686-2:2012 and ISO 15686-3:2002.

The design assumes a top liquid level no higher than the operational freeboard, contents at ambient temperature with specific gravity as detailed. No loads, cut-outs or fitments should be applied to the tank without prior consultation and advice. In circumstances where commercial factors or ongoing process requirements dictate that future access for inspection and maintenance will be impractical, the end user may wish to consider cathodic protection. The application considerations are set out in our Glass-Fused-to-Steel Specification Guide and the chemical resistance and physical properties of the glass coatings are published in Quality Standards, copies are available upon request.

Permastore assumes that the structure(s) provided as part of this quotation are to be constructed on to suitably designed and verified civil foundations. Whether the foundation is new or existing does not preclude the requirement to ensure the ground conditions and civils design are suitable for the applied loads from the new Permastore tank structure(s). Project specific loads applied from the Permastore tank structure will be provided during the Sales order process. Permastore assume no responsibility for issues arising from insufficient or unsuitable foundation designs.

1



## Project Scope:

**DESIGN CRITERIA BASED ON CUSTOMER SPECIFICATION**

| T1 - Thermophilic Digester Tank | |
|---|---|
| Design Code: | EN ISO 28765:2016 |
| Certification: | None |
| Seismic: | Location: Nevada, Iowa<br>Ss = 6.0% S1 = 3.0%<br>Use Group: I<br>Site Class: D - to be confirmed prior to order placement |
| Wind Speed: | 115.0mph |
| Specific Gravity: | 1.10 |
| Operating Pressure: | 15.00" of WG |
| Test Pressure: | 21.00" of WG |
| Vacuum: | 2.00" of WG |
| Temperature: | 120°F with occasional peaks up to a maximum of 130°F |
| Glass Grade: | TRIFUSION® with Top 2 Rings and Roof TRIFUSION® PLUS |
| External Colour: | Blue 20-C-40 (similar to MUNSELL 5PB 2/4) |
| Quantity: | 8 |
| Model Reference: | 8470 |
| Diameter: | 84' 1" |
| Height: | 64' 7" (less 5" in the base) |
| Capacity: | 2,661,057 US Gallons |
| Freeboard: | 0" |
| Base: | Rebate |
| Roof: | Yes - PERMADOME® Parallel Beam |
| Live Load: | 15psf |
| Snow Load: | 25psf |
| Tank Ancillaries: | 1 x 31" Ø Epoxy coated mild steel tank wall access manway.<br>3 x 16" Ø Epoxy coated mild steel double flanged connection (ANSI B16.5 150#). 2 x 4" Ø Epoxy coated mild steel double flanged connection (ANSI B16.5 150#). 4 x 8" Ø Epoxy coated mild steel double flanged connection (ANSI B16.5 150#). 1 x 2" Ø Epoxy coated mild steel double flanged connection (ANSI B16.5 150#). |
| | Helical Stair, Roof Stairs & Walkways, Bridging Walkways & Peripheral H/rails to 8 Tanks. |
| | 1 x Cladding Rail Kit |

All tanks include fixings, galvanized top stiffeners, galvanized web truss stiffeners (as required), primer painted base angles, polyurethane panel sealant, peripheral base seal, hydrophilic base seal, expanding anchor bolts and shims.

Pricing Summary:

| Qty. | Summary | Pricing |
|---|---|---|
| 1 | Model 8565 SR (9") Tank materials (per tank pricing) | $1,109,000.00 |
| 1 | Model 8565 SR (9") Tank installation (per tank pricing) | $215,000.00 |
| 1 | Model 8565 SR (9") Tank Foundation design (will require a geo report) (per) | $2,500.00 |
| T | Total for (8) Tanks Installed | $10,612,000.00 |
| Optional | 2" Polyisocyanurate Insulation System (R-Value 13.1) Includes material and installation for roof and sidewall | $1,812,900.00 |
| Optional | Foundation Installation (per our drawing 19T-004 Nevada, IA) excludes site clearing and prep. | $1,422,222.00 |
| | Total for (8) tanks Installed with all add options | $13,847,122.00 |

*Please note, if a bond is required, Weston will send the amount for approval in the form of a Change order.

2

13,400,000

Project Schedule:

- P.O. to Approval: 1-2 Weeks
- Approval to Manufacturing: 1 Week
- Manufacturing: 10 – 12 weeks
- Freight to jobsite: 2 weeks
- Construction of Foundations: 2 weeks (per tank) 14 days
- Construction of Tank: 5 weeks (per tank) 35 days
- Hydro Test / pressure test: 1 week
  - Total project timeline: 38 weeks

# **TERMS AND CONDITIONS**

### 1  SITE CONDITIONS:

Buyer will provide a suitable, clear, safe, dry, leveled, compacted staging area adjacent to the tank foundation and extending 25 ft. around the tank foundation. A graveled or hard surface access roadway from a public road to erection site, so that loaded trucks can be driven to a point adjacent to tank foundation, must be provided and maintained. Minimum clearance of six (6) feet is required between tanks, eight feet overhead. If work is located inside building or enclosed area, it must be noted in the Contract. Free access to work site must be provided by Buyer during daylight hours on all working days including Saturday, Sunday, U.S. holidays and country or regions pacific holidays if outside U.S. If 8 hours, 5day week is required, Buyer must specify. Buyer will ensure all tank parts are within 50 feet of tank foundation with no interfering objects. Weston and or the construction contractor will be allowed access for a truck to be placed and operated at the erection site. Should concealed, unusual, unexpected, and/or unrecorded conditions be encountered which interfere with normal erection procedures, Weston and or the construction contractor will advise Buyer of conditions encountered.

### 2  FOUNDATIONS:

Top of foundation must be within 2 feet of grade. If higher or on structures, price will be adjusted. It is the Buyer's responsibility to provide a level and true foundation, with level tolerances of 0.5 inches per ten (10) feet. Buyer is responsible for establishing center lines on foundations or structures. If Weston and or the construction contractor or erection contractor finds inaccuracies or deficiencies in foundation work done by others, or is required to alter the tanks to make them fit, the Buyer shall be notified and if Buyer instructs Erector to make necessary changes, erection contractor shall be reimbursed for the cost of material and labor used. In any event, the Buyer will reimburse erection contractor for the cost of lost time by the erection crew and equipment.

If a tank embedment ring is required, Weston and or the construction contractor personnel will be required to inspect the installation of the ring prior to concrete being poured. Proper installation and roundness tolerance is the responsibility of the contractor providing concrete installation.

Location of all plumbing located within the foundation, concrete slab, or underground, is the responsibility of others, and Weston and or the construction contractor is not liable for accuracy of location related to the tank.

If Foundation Design is required, customer is to supply Geotechnical Soils Report. Unless otherwise noted, all foundation construction shall be done by others.

3

**3   EXCLUSIONS:**

This Contract does not include unloading, hauling, grouting, or washing, painting
(other than touch-up on erection scratches), welding, load lines or other systems installation unless stated as being
included. The responsibilities of Weston and or the construction contractor will not include liability for demurrage.
All licenses, fees, permits, taxes or any items or services not specifically mentioned are excluded. Weston and or
the construction contractor will not be responsible for damage to personnel, automobiles, or machines within 100
feet of erection site.

**4   CONTINUOUS OPERATION:**

Buyer will ensure all operations are continuous, scheduled and completed in accordance with suggested sequence
throughout erection and finishing with a completed water test and inspection. Weston and or the construction
contractor will not be liable for any reason whatsoever for any indirect, incidental, special or consequential
damages.

**5   INSPECTION:**

Buyer inspection and acceptance of interior and exterior must be performed during and prior to erection crew leaving
jobsite. Delay caused by Buyer will be charged to Buyer.

**6   CHANGES:**

If the Buyer orders extra work or makes changes by altering, adding to, or deducting from the work set forth in this
quote, the price and any completion date quoted will be adjusted accordingly. The price adjustment will include
costs of engineering, shipping, manufacturing performed, materials purchased, extra erection expense, extra
supervisor and administration expense.

**7   BUYER'S RESPONSIBILITY:**

Buyer will supply, if required, 120 volt/60 Amp AC current at no cost, within 10 feet of tank foundation and
necessary utilities including, but not limited to, the necessary sanitary facilities and palatable drinking water as
required for the performance of the contract. Foundation will be clean and clear of any obstruction, material, or
equipment. Adequate clearance will be provided around the tank foundation area as well as overhead. Buyer is
responsible for supplying trash dumpster at job site and for disposing of contents of dumpster.

**8   HYDRO-TEST:**

Weston and/or the construction contractor will supply and install blind flanges for all nozzles for performing Hydro-
Test. Buyer shall provide water, hoses, and pumping to fill the tank for the Hydro-Test, and any subsequent fillings
after that are the responsibility of the Buyer. If a leak is disclosed during the hydro-test, a Weston and or the
construction contractor service personnel will be dispatched immediately. Buyer is responsible for emptying and
disposing of water after testing.

4

**9   BUYER'S INSURANCE:**

The Buyer will obtain insurance and indemnify Weston and or the construction contractor against loss by fire, lightning, removal, and all extended coverage perils, theft, vandalism, and malicious mischief, earthquake, negligence, breach of contract and any other insurance which the Buyer deems necessary upon the work covered by the Contract, for the full insurable value thereof. Additional expense by theft will be reimbursed to Weston and or the construction contractor by Buyer. Cost of security guards, if required, to be paid by Buyer. Weston and or the construction contractor is to be named as an additional insured and a certificate of insurance is to be provided at the time the order is agreed upon.

**10 EXCEPTIONS and CLARIFICATIONS:**

* Material pricing here within, after the quote valid until date, will be subject to Producing Mill Increase or Decrease and any applicable increase or decrease of material surcharges at the time of order placement from the Producing Mill or Steel Supplier.
* Unless otherwise noted, Weston has quoted standard design, fabrication, accessories (perimeter handrails, ladders, etc.) and coatings.
* Pricing does not include piping, valves, brackets, or elbows (other than interior fill & overflow to grade) unless specifically mentioned in accessories area. Any pipes supplied by Weston and or the construction contractor will not have coating applied to the interior of the pipe.
* All electrical, wiring and calibration by others.
* This quote does not include disinfection at jobsite, unless otherwise noted.
* No bonds, permits, sales and/or use tax included.
* LIQUIDATED DAMAGES WILL NOT BE ACCEPTED.
* If tank construction is required during the months of October and March, additional charges may apply depending on the Winter Weather Conditions at the jobsite location.
* Customer is responsible for unloading of tank materials at site and locating them within 50 feet of the tank foundation. Weston and or the construction contractor recommends the use of a 10,000 lb forklift for off-loading.

**Please sign, date and return to** andy@westonacllc.com **to place an order for this quote.**

| | |
|---|---|
| _____ | _____ |
| **Authorized Signature** | **Date** |



NOT FOR CONSTRUCTION

**NOTES:**

1. THIS DOCUMENT IS FOR BID PURPOSES ONLY AND IS NOT INTENDED FOR CONSTRUCTION.
2. SUBGRADE TO BE PREPARED AS NEEDED TO ACHIEVE THE ALLOWABLE SOIL BEARING PRESSURE OF AT LEAST 4,500 PSF.
3. MAXIMUM TOTAL SETTLEMENT TO BE LIMITED TO 2". MAXIMUM DIFFERENTIAL SETTLEMENT (CENTER TO EDGE) TO BE LIMITED TO 1/2" IN 25 LINEAR FEET.
4. ALL CONCRETE SHALL HAVE A MINIMUM 4,000 PSI 28 DAY COMPRESSIVE STRENGTH IN ACCORDANCE WITH ACI 318.
5. CONCRETE AGGREGATE SHALL COMPLY WITH ASTM C33 WITH A MAXIMUM AGGREGATE SIZE OF 1".
6. ALL REINFORCEMENT STEEL SHALL CONFORM TO THE ASTM A615 GRADE 60 SPECIFICATION.
7. DETAILING OF BAR SUPPORTS FOR REINFORCING STEEL SHALL BE IN ACCORDANCE WITH THE ACI STANDARD DETAILS AND DETAILING OF CONCRETE REINFORCEMENT AS REPORTED BY ACI COMMITTEE 315.
8. UNLESS PROHIBITED OTHERWISE BY THE PROJECT SPECIFICATIONS OR THE OWNER'S REQUIREMENTS, FOUNDATIONS MAY BE EARTH-FORMED WHERE SOILS ARE COHESIVE ENOUGH TO SUPPORT A VERTICAL FACE WHILE THE EXCAVATION IS OPEN. EARTH-FORMED EXCAVATIONS SHALL BE CLEAN, NEAT, AND TRUE TO THE SPECIFIED MINIMUM DIMENSIONS. LOOSE SOILS AND DEBRIS SHALL BE REMOVED FROM THE EXCAVATION PRIOR TO PLACING CONCRETE. CONCRETE SHALL NOT BE PLACED AGAINST WET, SOFT OR FROZEN SOILS. TOLERANCES SHALL BE INCOMPLIANCE WITH ACI-117. EARTH-FORMED EXCAVATIONS SHALL BE NO DEEPER THAN 48".

**DESIGN CODES:**
IBC 2012
AWWA D100-09
ASCE 7-10

**DESIGN PARAMETERS:**
Roof Live Load = 15 psf
Roof Snow Load = 25 psf
Design $S_s$ = 1.0
Design Internal Pressure = Atm.
Design External Pressure = Atm.
Wind (ASCE 7-10):
  Risk Category = II
  Ultimate Speed = 120 (3 Sec. Gust, mph)
  Exposure Category = C
Seismic (AWWA D100-09):
  $S_s$ = 0.081 g   $S_{DS}$ = 0.065 g
  $S_1$ = 0.044 g   $S_{D1}$ = 0.0070 g
  $A_v$ = 0.01 g
  Seismic Use Group = I (AWWA D103)
  Soil Site Class = D
  Seismic Design Category = B (ASCE 7)



GENERAL SECTION
SCALE: 3/4" = 1'-0"

---

42.02' I.S. TANK RAD.

LEVELING PLATE W/ BOLTS, BASE ANGLE, & SEALANTS
(PER TANK MANUFACTURER)

(2) #5 HOOP BARS
SPLICE = 31"

#5 BARS
@12" C.C. EACH WAY
SPLICE = 24"

#4 BARS
@ 12" C.C.

(14) #8 HOOP BARS
SPLICE = 90"

3" MIN. COMPACTED GRAVEL

PREPARED SUBGRADE

40'-8" I.S. FOOTING RAD.

43'-8" O.S. FOOTING RAD.

(10) #8 HOOP BARS
SPLICE = 99"

(3) MIN. SHEAR KEYS
(PER TANK
MANUFACTURER)

#6 BARS
@ 12" C.C.

FINISHED GRADE

3/16" TYP.

10"
EMB.

---

**CUSTOMER:**
BID

**CUSTOMER NUMBER:**

**PROJECT TITLE:**
2.5 MG Q.S.T.
MODEL 8565.5R20
84 1/24'Ø X 61'-46" H.L.L.

**LOCATION:**

**HSE PROJECT #:**
18P.0004

**DRAWN BY:**
DWM

**CHECKED BY:**
MGH

**REVISIONS:**

**DATE:**
11/52/2019

**SHEET TITLE:**
EMBEDDED RING
FOUNDATION BID DETAIL

**SHEET NUMBER:**
BID.01

HODGE
2124 E 37TH STREET
DAVENPORT, IA 52707
563-422-2256
563-412-2258 (Fax)
www.hodgeequipment.com

## IN THE IOWA DISTRICT COURT FOR STORY COUNTY

| | | |
|---|---|---|
| VERBIO NORTH AMERICA CORPORATION, | ) ) ) | Case No. _____ |
| Plaintiff, | ) ) | |
| v. | ) ) | **ORIGINAL NOTICE** |
| WESTON AND ASSOCIATES, LLC, | ) ) | |
| Defendant. | ) ) ) | |

**TO: WESTON AND ASSOCIATES, LLC.**

You are notified that a petition has been filed in the office of the clerk of this court naming you as a defendant in this action. A copy of the petition (and any documents filed with it) is attached to this notice. The name and address of the attorneys for the plaintiff are Todd M. Lantz and David N. Fautsch, The Weinhardt Law Firm, 2600 Grand Avenue, Suite 450, Des Moines, Iowa 50312. The attorneys' phone number is 515-244-3100; facsimile number 515-288-0407.

You must serve a motion or answer within 20 days after service of this original notice upon you, and within a reasonable time thereafter, file your motion or answer with the Clerk of Court for Story County, at the county courthouse in Nevada, Iowa. If you do not, judgment by default may be rendered against you for the relief demanded in the petition.

If you require the assistance of auxiliary aids or services to participate in court because of a disability, immediately call your district ADA coordinator at 641-421-0990. (If you are hearing impaired, call Relay Iowa TTY at 1-800-735-2943).

(SEAL)

_____

Story County Clerk of Court
Story County Courthouse
Nevada, IA 50201

**IMPORTANT:** YOU ARE ADVISED TO SEEK LEGAL ADVICE AT ONCE TO PROTECT YOUR INTERESTS

E-FILED 2020 APR 14 2:53 PM STORY - CLERK OF DISTRICT COURT

# STATE OF IOWA JUDICIARY

*Case No.* LACV051844

*County* Story

*Case Title* VERBIO NORTH AMERICA CORP VS WESTON & ASSOC

**THIS CASE HAS BEEN FILED IN A COUNTY THAT USES ELECTRONIC FILING.**
Therefore, unless the attached Petition and Original Notice contains a hearing date for your appearance, or unless you obtain an exemption from the court, you must file your Appearance and Answer electronically.

You must register through the Iowa Judicial Branch website at http://www.iowacourts.state.ia.us/Efile and obtain a log in and password for the purposes of filing and viewing documents on your case and of receiving service and notices from the court.

**FOR GENERAL RULES AND INFORMATION ON ELECTRONIC FILING, REFER TO THE IOWA COURT RULES CHAPTER 16 PERTAINING TO THE USE OF THE ELECTRONIC DOCUMENT MANAGEMENT SYSTEM:**
http://www.iowacourts.state.ia.us/Efile

**FOR COURT RULES ON PROTECTION OF PERSONAL PRIVACY IN COURT FILINGS, REFER TO DIVISION VI OF IOWA COURT RULES CHAPTER 16:** http://www.iowacourts.state.ia.us/Efile

*Scheduled Hearing:*

If you require the assistance of auxiliary aids or services to participate in court because of a disability, immediately call your district ADA coordinator at **(641) 421-0990** . (If you are hearing impaired, call Relay Iowa TTY at **1-800-735-2942**.)

*Date Issued* 04/14/2020 02:53:44 PM



*District Clerk of* Story          *County*

/s/ Dorian Myhre